UNITED STATES of America, Appellee,

v.

John TEJEDA, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Paul CHRISTIAN, Defendant, Appellant.

Nos. 91–1332, 91–1388.

United States Court of Appeals,
First Circuit.

Heard Feb. 3, 1992.

Decided Sept. 1, 1992.

Thomas G. Murray, Springfield, Mass., for appellant Tejeda.

Edward J. Lee with whom Hale, Sanderson, Byrnes & Morton, Boston, Mass., was on brief, for appellant Christian.

William F. Sinnott, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CYR, Circuit Judge, and COFFIN and CAMPBELL, Senior Circuit Judges.

CYR, Circuit Judge.

At their jury trial, defendants John Tejeda and Paul Christian were convicted of conspiracy to possess 500 or more grams of cocaine, with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(B)(ii). Christian was convicted of the related substantive offense under 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii), and of possessing one-half ounce of cocaine, with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Defendants raise several issues on appeal. Tejeda alone challenges

the sufficiency of the evidence. We affirm their convictions.

# I

## BACKGROUND

During July 1990, after Thomas Miller, a paid government informant, first made known his interest in buying cocaine and defendant Paul Christian indicated that he was receptive to the idea, Miller contacted the United States Drug Enforcement Agency (DEA) and was put in touch with DEA Special Agent Stephen Tomaski. Shortly thereafter, Miller and Christian arranged and consummated a "sample" one-half ounce cocaine transaction at Sun Foods Plaza in Lowell, Massachusetts. A series of phone calls promptly led to their final transaction, for approximately two kilograms of cocaine.

On August 3, while several DEA agents and local police officers watched, Miller again met Christian at Sun Foods Plaza. During their on-scene negotiations, it immediately became apparent that Christian was not acting alone, as he left Miller three times to confer with a small group of individuals standing in the nearby parking lot. Defendant John Tejeda was among the individuals in the group. After the two kilogram transaction was consummated, Christian and Tejeda were arrested.

# II

## DISCUSSION

### A. TEJEDA APPEAL

#### 1. *Sufficiency of the Evidence*

Tejeda challenges the sufficiency of the evidence supporting his conspiracy conviction. We view the evidence in the light most favorable to the verdict, in order to determine whether a rational trier of fact could have found guilt beyond a reasonable doubt. *United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir.1992); *United States v. Vargas*, 945 F.2d 426, 427–28 (1st Cir. 1991). All reasonable inferences are drawn in favor of the verdict and any credibility determination must be compatible with the judgment of conviction. *United States v. Batista–Polanco*, 927 F.2d 14, 17 (1st Cir. 1991). A sustainable conspiracy conviction requires direct or circumstantial evidence which establishes beyond a reasonable doubt " 'that the defendant and one or more coconspirators intended to agree and ... to commit the substantive criminal offense which was the object of their unlawful agreement.' " *United States v. Lopez*, 944 F.2d 33, 39 (1st Cir.1991) (quoting *United States v. Sanchez*, 917 F.2d 607, 610 (1st Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991)). "Due to the clandestine nature of criminal conspiracies, the law recognizes that the illegal agreement may be either 'express or tacit' and that a ' "common purpose and plan may be inferred from a development and collocation of circumstances." ' " *Sanchez*, 917 F.2d at 610 (quoting *United States v. Rivera–Santiago*, 872 F.2d 1073, 1079 (1st Cir.1989) (quoting *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942))). The record discloses ample evidence that Tejeda conspired with Christian to possess more than 500 grams of cocaine, with the intent to distribute it to informant Miller.

The goings-on at Sun Foods Plaza on August 3 were detailed in trial testimony by Miller and various law enforcement officers who witnessed the following events. After informant Miller and undercover DEA Agent Tomaski showed Christian $50,000 in cash, Miller asked to see the cocaine. Christian said he needed to speak to some people whom he had "had to" bring with him. Christian walked a short distance from Miller and Tomaski, out of hearing range, to a small group of three or four Hispanic males. At trial, government witnesses testified that Christian appeared to be engaged in conversation while in the presence of the group. Christian returned to Miller, handed him a car key, pointed toward a brown Pontiac Bonneville, and told Miller that there were two kilograms of cocaine in the trunk. After opening the car trunk with the key given to him by Christian, Miller examined the cocaine. Upon returning to Christian, Miller ex-

pressed dissatisfaction with the quality of the cocaine and demanded a lower price.

Christian again left Miller and met with the group, which had thinned to two or three individuals. Miller testified that Tejeda stood face-to-face with Christian during this encounter. Shortly, Christian returned to Miller and offered him a slightly lower price. Miller suggested that he would give Christian $5,000 for himself, if Christian would lower the price further. For a third time, Christian met with his apparent confederates, Tejeda still among them. Upon Christian's return, he and Miller closed the deal. As Miller again opened the trunk of the Pontiac Bonneville, ostensibly to make a final examination of the cocaine, defendants were arrested.

Tejeda argues on appeal that the evidence was insufficient to establish more than "mere presence" at the scene of the crime. *See, e.g., United States v. Ocampo,* 964 F.2d 80, 82 (1st Cir.1992) ("Mere presence at the scene of a crime is insufficient to prove membership in a conspiracy."). On the contrary, the circumstantial evidence alone was sufficient to defeat Tejeda's claim of mere presence. As we have said many times, "the fact-finder may fairly infer ... that it runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses to their crimes. *See United States v. Passos–Paternina,* 918 F.2d [979,] 985 [ (1st Cir.1990) ] ('understanding of human behavior' may ground reasonable inference from circumstantial evidence)." *Batista–Polanco,* 927 F.2d at 18. *See also Ortiz,* 966 F.2d at 712.

The claim of mere presence is belied by the testimony of Inspector Robert Caron of the Lowell Police Department as well. At the time of the third and final encounter between Christian and the nearby group which included Tejeda, Inspector Caron was stationed in a vehicle approximately thirty feet away, with an unobstructed view. Caron testified that he saw Christian conversing *with Tejeda,* observed head and lip movements, saw Christian pointing back toward where Miller was standing, and saw Tejeda nod his head. Thus, the jury reasonably could have found, on Caron's testimony, that Tejeda directly conversed with Christian during their third and final meeting. " 'Neither juries nor judges are required to divorce themselves of common sense, but rather should apply to facts which they find proven such reasonable inferences as are justified in the light of their experience as to the natural inclinations of human beings.' " *Batista–Polanco,* 927 F.2d at 18 (quoting *United States v. Smith,* 680 F.2d 255, 260 (1st Cir.1982)); *Ortiz,* 966 F.2d at 712 ("[J]urors are neither required to divorce themselves from their common sense nor to abandon the dictates of mature experience."); *see Vargas,* 945 F.2d at 429 (deference is owed to reasonable inferences drawn by the jury based on its collective knowledge of human behavior); *see also Batista–Polanco,* 927 F.2d at 19 (agreement to violate the law inferable from a " 'development and a collocation of circumstances' ") (quoting *Glasser,* 315 U.S. at 80, 62 S.Ct. at 469).[1] There was sufficient circumstantial evidence to convict Tejeda on the conspiracy charge.

### 2. Evidentiary Rulings

Tejeda asserts that the district court twice improperly admitted "other act" evidence under Federal Evidence Rule 404(b). The first instance involved testimony about a beeper seized from Tejeda's person; the second a 1988 search of Tejeda's apartment.

#### a. The Beeper Evidence

■ DEA Agent Tomaski testified that a beeper, seized from Tejeda's person at the time of his arrest, activated four

---

**1.** Tejeda's criminal involvement is corroborated by other circumstantial evidence and related inferences. The evidence established a circumstantial link between Tejeda and the Pontiac Bonneville in which the two kilograms of cocaine were delivered to the scene of the crime on August 3. The documents found in the vehicle after its seizure showed that, shortly before August 3, the Bonneville had been transferred to Elva Collazo, of 141 Fayette Street, Lowell, Massachusetts, the residence address Tejeda gave at "booking." The evidence revealed that Tejeda's sister, Mercedes, lived at 141 Fayette Street as well.

days later. Tomaski dialed the calling number. The person who answered asked if the caller was "Johnny." Tomaski responded that he was taking care of Johnny's business. The individual on the other end said: "I need a quarter"; and "Make sure to break the quarter into two halves." Within the next half hour, Tomaski set up a meeting and arranged to have another officer make the undercover cocaine sale. Tomaski testified that the putative purchaser tendered $250, the approximate price for an eighth of an ounce of cocaine at the time. Tejeda does not contend that his possession of the beeper at the time of arrest was inadmissible evidence, but that Tomaski's testimony was inadmissible under Rule 404(b), as it was relevant only to show bad character. We disagree.

As the district court correctly observed, Tomaski's testimony did not directly implicate Rule 404(b) at all, inasmuch as it did not purport to evidence Tejeda's participation in the undercover drug sale Tomaski arranged through the beeper following Tejeda's arrest. Moreover, were the jury to find the post-arrest message Tomaski purportedly received on Tejeda's beeper probative of the purpose for which Tejeda had been carrying the beeper at the time of his arrest, it would not be because Tejeda participated in the post-arrest cocaine transaction, but because the jury reasonably inferred that the beeper was an instrumentality of pre-arrest cocaine trafficking by Tejeda. Thus, the beeper evidence was highly probative of Tejeda's knowledge, intent and preparation, and tended to make it less likely that Tejeda's presence at the scene of the cocaine transaction on August 3 was an innocent mistake. See Fed. R.Evid. 401, 404(b).[2] The district court correctly determined that Tomaski's testimony, if credited by the jury, tended to demonstrate a relevant purpose served by Tejeda's possession of the beeper at the time of his arrest at the scene of the cocaine transaction related to the conspiracy charge. See, e.g., United States v. Shenker, 933 F.2d 61, 63 (1st Cir.1991) (district court should exclude evidence if relevant only to show bad character or propensity); see also United States v. Fields, 871 F.2d 188, 196 (1st Cir.) (evidentiary uses listed in Rule 404(b) not exhaustive), cert. denied, 493 U.S. 955, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989).[3]

In sum, Tomaski's testimony that Tejeda possessed the same beeper through which a third party later attempted to facilitate a cocaine transaction tended to make it more likely that Tejeda's presence during the cocaine transaction at Sun Foods Plaza on August 3 was knowing and intentional. See Fed.R.Evid. 401, 404(b). In any event, the probative value of the evidence outweighed any danger of unfair prejudice, see, e.g., United States v. Rodriguez Cortes, 949 F.2d 532, 540–41 (1st Cir.1991) (Rule 403 balancing addressed to sound discretion of trial court), particularly in light of the careful limiting instruction given by the district court, see supra note 2.[4]

---

**2.** The prudent limiting instruction given by the district court diminished any danger that the post-arrest cocaine transaction arranged by Tomaski might be attributed to Tejeda. Before Tomaski testified, Judge Keeton cautioned the jury:

> [Y]ou are to consider this evidence *only* for whatever weight you think it has *as bearing upon explanation of the possession of* what has been referred to as *a beeper by the defendant Tejeda on August 3rd,* on the date of the transactions and as of the time of those transactions of August 3rd. (Emphasis added.)

**3.** The district court stated that Tomaski's testimony would "throw[ ] light on the other act that is not another bad act but one that is within the scope of the conspiracy itself, possession of the beeper at the very time of the transaction and arrest...." *See United States v. Sullivan,* 919

F.2d 1403, 1420 (10th Cir.1990) ("As a general rule, evidence that the defendants possessed weapons or other paraphernalia that may have been used in committing the crime for which they are charged is relevant."); *cf. Ortiz,* 966 F.2d at 714 (discussing permissible inference from possession of beeper at time of drug transaction); *United States v. Roldan–Zapata,* 916 F.2d 795, 805 (2d Cir.1990) (finding possession of drug paraphernalia relevant even if items might only have been used for uncharged offenses unrelated to transactions within the scope of the conspiracy indictment), *cert. denied,* — U.S. —, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991).

**4.** The district court plainly conducted the appropriate Rule 403 balancing: "[T]his is very relevant evidence, and it's [sic] probative weight against both defendants for legitimate purposes

### b. Evidence of 1988 Search

■ The other evidentiary ruling challenged by Tejeda relates to the testimony of Inspector Hilda Fernandez concerning a search of Tejeda's apartment at 141 Fayette Street in 1988.[5] The evidence included Tejeda's admission that he knew that cocaine trafficking was being conducted from 141 Fayette Street in 1988—the same apartment at which Tejeda was residing when arrested on August 3, 1990, and the residential address of Elva Collazo, as reflected on a document seized from the brown Pontiac Bonneville in which the cocaine was transported to Sun Foods Plaza on August 3. The cocaine trafficking and residential links between Tejeda and 141 Fayette Street, in 1988 as well as 1990, were admissible to counter Tejeda's primary contention that he was an unwitting member of the small group with whom Christian consulted on three occasions during the course of the presale cocaine negotiations at Sun Foods Plaza on August 3. There was legitimate probative value in the Tejeda admissions.[6]

Finally, at most the admission of the Fernandez testimony was harmless nonconstitutional error, as Tejeda declined a limiting instruction. *See, e.g., United States v. Arias–Montoya,* 967 F.2d 708, 714 (1st Cir. 1992) (applying "harmless error" review to Rule 404(b) ruling). "A nonconstitutional evidentiary error under Rule 404(b) will be treated as harmless if it is 'highly probable' that the error did not contribute to the

verdict." *Id.* (citing *United States v. Garcia–Rosa,* 876 F.2d 209, 222 (1st Cir.1989)). The independent circumstantial evidence against Tejeda was overwhelming. *See Arias–Montoya,* 967 F.2d at 714 (examining strength of government's case in isolation from "other act" evidence). We conclude that it is highly probable that any error in the admission of the Fernandez testimony did not contribute to the verdict, particularly in light of the independent establishment of the contemporaneous circumstantial connection on August 3, 1990, between Tejeda and the cocaine delivery vehicle.

### B. CHRISTIAN'S APPEAL

#### 1. *Informant's Identity and Whereabouts*

■ Christian filed a pretrial motion demanding disclosure of the identity and whereabouts of Thomas Miller, the informant who bought cocaine from Christian on July 24 and August 3, 1990. Pretrial disclosure was alleged to be necessary so that Christian could conduct an "appropriate background investigation and otherwise be prepared to effectively cross-examine." The motion was denied, without prejudice to its renewal at trial in the event the informant did not testify. The magistrate correctly ruled that Christian "offered no 'concrete circumstances that might justify overcoming both the public interest in encouraging the flow of information ... and the informant's private interest in his own

is the *primary weight* of the evidence." (Emphasis added.)

**5.** Inspector Fernandez testified that she participated in the execution of a search warrant at 141 Fayette Street in Lowell, on December 4, 1988. In Tejeda's bedroom, she found a small package of white powder on the headboard of his bed. Tejeda was in the bedroom at the time. A coat in Tejeda's bedroom closet contained $1,037.00 in cash. In a downstairs bathroom, the search party found a scale, scissors, and plastic baggies. Seven plastic baggies containing white powder were found. Tejeda told Fernandez that "he was aware of the cocaine operation out of the house, but his roommate was the one that was doing mostly all the dealing out of there." Tejeda further informed Fernandez that he and his roommate had "received stolen property in return for cocaine in the past." On

cross-examination, Fernandez testified that Tejeda was convicted of cocaine possession in connection with these events.

**6.** We recognize that the primary probative force stemmed from the circumstantial link forged between 141 Fayette Street and Tejeda in 1990, since the circumstantial connection among Collazo, the Pontiac Bonneville, Tejeda and 141 Fayette Street comprised the most contemporaneous and probative evidence that the simultaneous presence of Tejeda and the Bonneville at Sun Foods Plaza on August 3 was no accident. By the same token, the other evidence, particularly Tejeda's admissions that cocaine trafficking (for which he disclaimed responsibility) had been conducted in his 141 Fayette Street residence in 1988, was corroborative of the circumstantial evidence that Tejeda was not an "innocent bystander" at the crime scene in 1990.

safety.' " *United States v. Estrella,* 567 F.2d 1151, 1153 (1st Cir.1977) (citations omitted). The district court upheld the ruling.

Three days before trial, the government released Miller's full name to the defendants, without disclosing his whereabouts. Thereafter, Christian made no request, either *through the court* or to the prosecutor, for permission to interview Miller in advance of trial. Nor did Christian request a trial continuance or recess to enable any interview to which Miller might accede, or to conduct discovery relating to the informant's background or his involvement in the relevant events.

Relying on *Roviaro v. United States,* 353 U.S. 53, 62, 65, 77 S.Ct. 623, 628, 630, 1 L.Ed.2d 639 (1957) (informant's *identity* may not be withheld by government under "informer's privilege" in face of repeated demands for disclosure; requiring case-by-case balancing of the public interest in protecting the flow of information against the right to prepare a defense), Christian nonetheless claims on appeal that Miller's central role in the cocaine transactions charged in the indictment, *cf. Batista-Polanco,* 927 F.2d at 19 ("informer's privilege" must give way if informant is sole participant and witness, other than defendant), mandated pretrial disclosure of Miller's full name *and address.*

The government responds that *Roviaro* is inapposite, as Miller was presented as a trial witness and subjected to intensive cross-examination by the defense. The government emphasizes its pretrial declaration of intention to call Miller as a trial witness, claiming that Miller was entitled to the same "protections" as its other witnesses, whose identities the government need not disclose before trial, *see United States v. Reis,* 788 F.2d 54, 58 (1st Cir.1986) (government not required to provide pretrial disclosure of the identity of its trial witnesses), and that Miller's name was disclosed three days before trial.[7]

We need not consider whether the *Roviaro* dicta, *see Roviaro,* 353 U.S. at 65 n. 15, 77 S.Ct. at 630 n. 15, would require disclosure of the address of an informant whom the government has announced its intention to call as a trial witness, as any *Roviaro* claim based on the failure to disclose the pretrial whereabouts of Miller must fail as surely as the request for pretrial disclosure of Miller's name. The magistrate correctly rejected the *Roviaro* claim on the ground that Christian "offered no 'concrete circumstances that might justify overcoming both the public interest in encouraging the flow of information ... and the informant's private interest in his own safety.' " (quoting *Estrella,* 567 F.2d at 1153). *See also United States v. Jackson,* 918 F.2d 236, 240 (1st Cir.1990) (upholding denial of demand for pretrial disclosure of informant's identity under *Roviaro,* as "request was based on 'mere speculation' that disclosure would be helpful" to test probable cause for arrest) (suppression hearing) (footnote omitted).

---

**7.** The magistrate and the district court, in denying Christian's pretrial requests for disclosure of Miller's identity, plainly left the disclosure request open to reconsideration in the event Miller did not testify. Moreover, while affording the government its full measure of discretion to withhold witness' identities until trial, *see Reis,* 788 F.2d at 58, the district court forewarned the government, in defense counsel's presence, that a delay might be necessary in the commencement of trial, or during trial, if the identity of the informant was not provided to the defense soon enough. Nevertheless, at no time thereafter did the defense request further information, or a trial continuance or recess to enable it to obtain further information, either about the informant or the informant's involvement. Finally, the pretrial disclosure motion denied by the magistrate merely requested disclosure of information, not access to the witness. While conceding before the district court that there was no right to a pretrial interview without the informant's consent, defense counsel in general terms asserted a need to learn of the informant's "background," without identifying any type of background information (except, possibly, a record of substance abuse, as to which the court reserved judgment) to which he would have been entitled prior to trial, pursuant to Federal Rule of Criminal Procedure 16. Thus, what we have is a conflated request for pretrial information as to the whereabouts of a government informant whose identity was made known prior to trial and who testified at trial. While Christian did not fairly present or preserve the instant claim, we briefly discuss the merits as well. We first attempt to disentangle defendant's conflated claims for relief in order to facilitate discussion of the discrete elements, beginning with the *Roviaro* claim.

The disclosure requirement in *Roviaro* was predicated on the failure of the prosecution to make *either* the informant *or* the informant's identity available to the defense in a case where the informant was *never called as a witness.* In contrast, Miller's identity was disclosed *prior to trial* and the government called Miller as a witness *at trial.* As the magistrate recognized, and the district court clearly concurred, the informer's privilege continued to protect the identity of the informant (including his whereabouts) from disclosure by the government until the privilege was dispelled by the government's disclosure of Miller's name prior to trial. *Roviaro,* 353 U.S. at 60, 77 S.Ct. at 627 ("informer's privilege" disappears once the informer's identity is disclosed "to those who would have cause to resent the communication"). At no time thereafter did the defense request further relief.

The subliminal considerations underlying Christian's pretrial disclosure request warrant no extensive discussion. That the Jencks Act authorizes the government to withhold the recorded statements of a prospective government witness until the witness completes his direct testimony, 18 U.S.C. § 3500(a); *United States v. Arboleda,* 929 F.2d 858, 863 (1st Cir.1991); *United States v. Grandmont,* 680 F.2d 867, 874 (1st Cir.1982), is too well recognized to require elaboration. That nothing in Criminal Rule 16 requires the government to disclose whom it will call as trial witnesses, as Christian seems to concede, likewise is beyond dispute. *See Reis,* 788 F.2d at 58; *United States v. Barrett,* 766 F.2d 609, 617 (1st Cir.), *cert. denied,* 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985). Finally, that a witness cannot be compelled to submit to a pretrial interview by an opposing party in a criminal case is not only conceded by Christian, but independently established. *See Arboleda,* 929 F.2d at 868 (" '[n]o right of a defendant is violated when a potential witness freely chooses not to talk....' ") (quoting *Kines v. Butterworth,* 669 F.2d 6, 9 (1st Cir.1981), *cert. denied,* 456 U.S. 980, 102 S.Ct. 2250, 72 L.Ed.2d 856 (1982)). Thus, absent a sustainable *Roviaro* claim, and there was

none, Christian's contention that the government was required to disclose either the identity or the whereabouts of Miller is unfounded.

### 2. *Entrapment*

██ Christian appeals the denial of an entrapment instruction. We review *de novo, United States v. Panet–Collazo,* 960 F.2d 256, 259 (1st Cir.1992), *petition for cert. filed* (U.S. June 29, 1992) (No. 92–5052), according the record evidence the light most favorable to the defense, *United States v. Rodriguez,* 858 F.2d 809, 815 (1st Cir.1988).

██ The entrapment defense comprises two elements: 1) government inducement, and 2) an absence of predisposition on the part of the defendant to engage in the alleged criminal conduct. *Panet–Collazo,* 960 F.2d at 259; *United States v. Pratt,* 913 F.2d 982, 988 (1st Cir.1990) (citing *Mathews v. United States,* 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988)), *cert. denied,* — U.S. —, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). A defendant is entitled to an entrapment instruction, provided that (1) "he produces some evidence to support *fairly* both elements," and (2) "[t]his evidence ..., if believed by a rational juror, [would be sufficient] to *create a reasonable doubt* that the defendant committed the crime of his own accord." *Panet–Collazo,* 960 F.2d at 259 (citations omitted) (emphasis added); *Pratt,* 913 F.2d at 988; *Rodriguez,* 858 F.2d at 814. The entrapment instruction criteria were not met. The record evidence would not support a reasonable inference that Christian was an "unwary innocent" rather than an "unwary criminal." *See Mathews,* 485 U.S. at 63, 108 S.Ct. at 886; *see also Jacobson v. United States,* — U.S. —, —, 112 S.Ct. 1535, 1541, 118 L.Ed.2d 147 (1992) (distinguishing child pornography case from "typical case" involving government-sponsored drug transaction where "the entrapment defense is of little use because the *ready* commission of the criminal act amply demonstrates the defendant's predisposition") (emphasis added); *United States v. Sullivan,* 919 F.2d 1403, 1418 (10th Cir.1990) (predisposition can be inferred from history

of criminal activity combined with "ready response to the inducement offer").

Christian did not produce evidence fairly supporting a lack of predisposition, "the principal element in the defense of entrapment," *Mathews*, 485 U.S. at 63, 108 S.Ct. at 886 (quoting *United States v. Russell*, 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973)). Instead, he contends that the government presented no evidence "of prior drug dealing or high living." Contrary to Christian's contention, however, there was some evidence that he was familiar with the cocaine trade. *See Pratt*, 913 F.2d at 989 (prior dealings in narcotics indicative of predisposition). Miller testified that Christian informed him during their July 18 meeting that one ounce of cocaine "would cost $1,200." Miller further testified that the going rate at that time was $1,000 to $1,400.[8]

Christian argues that (1) at his initial meeting with Miller, he merely agreed to ask "friends" about the availability of cocaine, not to provide cocaine, and (2) on a number of occasions "he didn't have the agreed on cocaine amount and avoided delivery." But there was ample evidence that Christian was eager to entertain Miller's overtures. Contrary to Christian's characterization of their initial meeting, Miller testified that he was told by Christian that Christian *"could maybe help me supply the cocaine*, he should have no problem with it, because he has lots of friends and most of his friends *front* him the cocaine." (Emphasis added.) Later the same day, Christian spontaneously remarked: "By the way, the price of a kilo would be $40,000."[9] Furthermore, Miller testified that after Christian sold him the one-half ounce on July 24, Christian "told me that whenever I'm ready, that he'd supply me with kilos of cocaine anytime." Later, on August 3, Miller made a final "presale" call to Christian and "told him that we're ready to do the deal. Mr. Christian told me that he was waiting for me to call. He thought I'd never get back to him. I told him I'd call him in two hours."

Finally, there is no basis in the record for Christian's contention that his participation in the two kilogram transaction on August 3 was the result of "persistent badgering" by the government informant. The evidence of so-called "aborted" deliveries was plainly attributable to Tejeda's delays in obtaining the cocaine, *see Pratt*, 913 F.2d at 989 (defendant's failure to telephone or appear at meetings attributable to difficulties in raising purchase money), or, as the district court suggested, an experienced person's wariness in dealing with a comparative stranger. The record indicates no more than that Miller initiated most of the telephone contacts with Christian and diligently pursued the undercover transactions.[10]

We conclude that the evidence was insufficient to support a fair inference that

---

**8.** The record reflects some familiarity with drug trade lingo as well. Miller testified that Christian told him that the "two keys of cocaine" were "only good for sniffing." On another occasion, when Miller asked whether the cocaine could be "cooked," Christian responded: "It's um.... puff. I don't know if it can be cooked. It probably can be fixed." Miller explained to the jury his understanding of "puff," as "a shaky cocaine, ... powdery, cut."

**9.** During their earlier meeting that day, Miller had told Christian that he was a cocaine dealer and would like to buy "a lot of" cocaine, "keys, kilos of cocaine." The subsequent one-half ounce deal was a "sample" transaction.

**10.** Between July 24 and 31, Miller made several phone calls to Christian, "basically to keep in touch." In the first of several phone calls from Miller to Christian on July 31, Christian said that he had been "just about ready to call" Miller. On August 1, when Miller called Christian to change the August 3 transaction to August 2, Christian informed Miller "that he could have all three kilos within the hour if [Miller] wanted them that day." Miller replied that August 2 would be "good enough," and Christian told Miller to call him the following morning. When Miller called the next day, Christian said that he had to go to New Hampshire to find his friend with the cocaine. Later that afternoon, Christian advised that he was ready, but Miller postponed the transaction until the following day.

On August 3, after failed attempts to reach one another, Christian called Miller and told him that he had two kilograms but was not sure if he would have three. After speaking with Special Agent Tomaski, Miller called Christian back and said that he would be interested even if there was only one kilogram, to which Christian said "not to worry, because he'll probably have three keys." As stated above, approximate-

Christian was "unprepared to commit the malefaction or that he was corrupted by any government agent." *United States v. Coady*, 809 F.2d 119, 122 (1st Cir.1987). The government afforded Christian an opportunity to become criminally involved, but the record unmistakably reveals that Christian was an altogether ready and willing, even eager, participant.[11]

### 3. *Severance*

 Finally, Christian contends that the district court committed reversible error by denying his motions for severance under Criminal Rule 14. Severance will be granted only on a strong showing of prejudice. *United States v. McLaughlin*, 957 F.2d 12, 18 (1st Cir.1992); *United States v. Martinez*, 922 F.2d 914, 922 (1st Cir.1991). We review the district court ruling for abuse of discretion, reversing only if its refusal to sever "deprived defendant of a fair trial, resulting in a miscarriage of justice." *McLaughlin*, 957 F.2d at 18; *United States v. Perkins*, 926 F.2d 1271, 1280 (1st Cir.1991). Christian contends that the "1988 search" evidence and the "beeper transaction" evidence[12] against codefendant Tejeda caused "prejudicial spillover," resulting in an unfair trial. We disagree.

Christian nevertheless contends that the jury was "irresistibly drawn" to consider the beeper evidence and the *1988 search* evidence. On the contrary, we are satisfied that the district court's explicit limiting instructions that the jury was not to consider the evidence against Christian, together with the instruction in its final charge—that the jury give separate consideration to the evidence against defendant as to each count—provided Christian sufficient protection from "prejudicial spillover." *See*

*United States v. Aponte–Suarez*, 905 F.2d 483, 494 (1st Cir.) (citing cases), *cert. denied*, —— U.S. ——, 111 S.Ct. 531, 112 L.Ed.2d 541 (1990), *and cert. denied*, —— U.S. ——, 111 S.Ct. 975, 112 L.Ed.2d 1061 (1991); *see also United States v. Molinares Charris*, 822 F.2d 1213, 1221 (1st Cir.1987) (limiting instruction can alleviate risk of prejudice from "other act" evidence admissible against different defendant). Neither type of evidence directly implicated Christian. *See, e.g., United States v. Dworken*, 855 F.2d 12, 29 (1st Cir.1988) (codefendant's "other acts" did not involve other defendants). Nor do we have reason to question the adequacy of the instructions, *cf., e.g., Molinares Charris*, 822 F.2d at 1221 ("other act" evidence instruction may be inadequate where evidence is "complex or confusing"), or that the jury was unable or unwilling to distinguish between the different defendants, *see Perkins*, 926 F.2d at 1282 ("no reason to believe that the jury was unable to give, or did not give, individualized attention" to appellant's case), or the different charges, *see Dworken*, 855 F.2d at 29 (trial was not "so long," nor evidence against codefendant "so disproportionate, that the jury could not readily discriminate amongst specific charges and defendants;" difficult to see "how the jury could have been seriously influenced" by evidence of codefendant's "other acts" not involving fellow defendants). The district court did not err in refusing to grant severance.

*The district court judgments are affirmed.*

---

ly two kilograms was brought to Sun Foods Plaza the next day.

11. We have no reason to question Christian's further suggestion that part of the reason he completed the August 3 deal was "the offer of money." *But see Panet–Collazo*, 960 F.2d at 259–60 (entrapment does not occur when person succumbs to greed); *Coady*, 809 F.2d at 122 (same; evidence merely showed that the government informant created a criminal opportunity "and sweetened the pot with an offer of payment.").

12. The district court properly instructed the jury not to consider the "beeper" evidence in relation to count 3, the "sample" transaction, charging Christian alone with possessing one-half ounce of cocaine, with intent to distribute. Later, when Tejeda's counsel began cross-examining Tomaski about the "beeper transaction," Christian requested a "continuing limiting instruction." The district court, without objection by the government, instructed the jury: "This testimony relates only to the charges against the defendant Tejeda, not to the charges against the defendant Christian."