July 1, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2196

UNITED STATES OF AMERICA,

Appellee,

v.

JOSEPH ARGENCOURT,
a/k/a JOE BLACK,

Defendant, Appellant.

No. 92-2197

UNITED STATES OF AMERICA,

Appellee,

v.

RODNEY J. ANDREONI,

Defendant, Appellant.

ERRATA SHEET

The opinion of this Court issued on June 23, 1993, is amended as
follows:

On page 9, line 3: change "elicted" to "elicited"

On page 12, n. 6, line 5: change "coversation" to "conversation"

One page 16, line 3: insert "provide" after "to" and replace the
comma after "of" to follow "providing"

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2196

UNITED STATES OF AMERICA,

Appellee,

v.

JOSEPH ARGENCOURT,
a/k/a JOE BLACK,

Defendant, Appellant.

No. 92-2197

UNITED STATES OF AMERICA,

Appellee,

v.

RODNEY J. ANDREONI,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Francis J. Boyle, Senior U.S. District Judge]

Before

Boudin, Circuit Judge,

Coffin and Oakes,* Senior Circuit Judges.

*Of the Second Circuit, sitting by designation.

Edward C. Roy with whom H. Robert Beecher was on brief for

appellant Joseph Argencourt.
James A. Ruggiero for appellant Rodney J. Andreoni.

Margaret E. Curran, Assistant U.S. Attorney, with whom James H.

Leavey, Assistant U.S. Attorney, and Lincoln C. Almond, United States

Attorney, were on brief for appellee.

June 23, 1993

COFFIN, Senior Circuit Judge. Defendants Rodney Andreoni

and Joseph Argencourt were charged in a two-count indictment

alleging their involvement in a cocaine distribution scheme.

Both men were convicted on Count 1, which charged a conspiracy to

distribute more than 500 grams of cocaine. Only Andreoni was

convicted on Count 2, which charged an attempt to distribute the

same quantity of the drug. Each appeals his conviction on

various grounds. We affirm.

I.

We shall begin with a brief description of the facts, as the

jury could have found them, adding more detail in later sections

as necessary to explain our conclusions.

The events underlying this case began in early 1991, when

the Federal Bureau of Investigation (FBI) initiated an undercover

operation to probe insurance fraud in Rhode Island and

Massachusetts. Andreoni was one of the targets of the

investigation. An undercover FBI agent, Gary Brotan, and an FBI

informant, Mark Vermyea, met some 60 times with Andreoni over a

period of approximately one year. During one of their

discussions, Brotan raised the topic of cocaine. Andreoni said

that he could provide substantial quantities of the drug.

In the course of several recorded conversations between

March 28, 1991, and August 5, 1991, Andreoni described one of his

sources as an individual from Pawtucket, Rhode Island, named "Joe

Black," which is an alias used by Argencourt. On August 26,

Andreoni, Argencourt, Brotan and Vermyea attended a meeting at a

-4-

restaurant in Seekonk, Massachusetts. The conversation, which

was recorded, began with introductions, followed immediately by

Andreoni's statement to Argencourt, "Tell him what the . . .

prices are right now." Argencourt responded without pause,

"Twenty eight." Supp. App. at 33. It is undisputed that this

price referred to a kilogram of cocaine.

The discussion at the meeting also touched on Argencourt's

cautious approach to drug dealing. Argencourt reported that he

previously had left drug trafficking "because of all the heat."

Supp. App. at 36. He said that he had been set up by an

informant who was wearing a wire, and he had not insisted that

Brotan and Vermyea be checked for wires only because Andreoni

said they could be trusted. Id. at 36-38. Argencourt said he

would kill anyone who "cops out" on him, and noted that he had

shot the informant who had worn the wire. Id. at 38.

The four men discussed the proposed cocaine transaction, and

eventually the deal was set for the upcoming Friday, August 30.

Id. at 53-55. Although no location was specified then, Andreoni

and Argencourt arranged in a phone conversation Thursday evening

to meet at 9:30 a.m. on Taunton Avenue in East Providence. Id.

at 65. Brotan, Vermyea and Andreoni met Friday morning at the

designated time and place, but Argencourt never appeared. An FBI

agent conducting surveillance reported seeing Argencourt's car,

however, near the appointed location, at about 10 a.m. Tr. Vol.

I at 104-06. The agent, who identified the car by its license

plate number, did not get a look at the driver. A few minutes

-5-

later, the agent saw the car parked a short distance away, but he

was unable to see if anyone was inside.

After the other three had waited for a while, Andreoni, at

the urging of Brotan and Vermyea, telephoned Argencourt's office

to find out why he was late. Andreoni first reported back that

he had spoken to Argencourt's secretary, who told him that

Argencourt had not returned from a 9:30 appointment. Supp. App.

at 71. After continuing to wait a substantial period of time,

the three men called off the deal and left.

Andreoni, Brotan and Vermyea met again on September 9, at

which time Andreoni suggested an alternative way of getting

cocaine. Id. at 82-83. Another meeting was held October 8.

Andreoni told the government agents that no one was selling

cocaine because they were nervous. Id. at 84-86. He also

reported that Argencourt would not return his phone calls.

The two defendants were arrested in early 1992 and charged

with conspiring to distribute the one kilogram of cocaine that

had been the focus of the August 26 meeting and August 30

rendezvous. No cocaine ever was seized.

II.

Both defendants claim that the evidence was insufficient to

support their conspiracy convictions. They claim that the

conversation during the August 26 meeting, although focused on a

possible cocaine deal, was vague and noncommittal and failed to

demonstrate the intent necessary to form an agreement to

distribute the charged amount of cocaine. See United States v.

-6-

O'Campo, 973 F.2d 1015, 1019 (1st Cir. 1992) (describing elements

of conspiracy).

The well-established standard for evaluating sufficiency

claims requires us to review the evidence as a whole, including

all reasonable inferences from that evidence, in the light most

favorable to the government. See, e.g., United States v. Tejeda,

974 F.2d 210, 212 (1st Cir. 1992). If, in so doing, we find that

a rational trier of fact could find guilt beyond a reasonable

doubt, we have no option but to affirm the jury's verdict. Id.

We may not weigh the evidence, and all credibility questions must

be resolved in favor of the verdict. United States v. Ortiz, 966

F.2d 707, 711 (1st Cir. 1992).

While we recognize that this case is unusual in that the

government recovered no cocaine from these defendants nor any

other physical evidence of drug dealing, we believe the tape-

recorded conversations and other circumstances were sufficiently

telling to support the jury's determination. Beginning in March

1991, Andreoni repeatedly assured Brotan and Vermyea that he

could arrange to purchase cocaine for them, and he mentioned

Argencourt as one of two possible suppliers. Argencourt appeared

at the August 26 meeting with Andreoni, and, without hesitation,

stated the price for a kilogram of cocaine. A jury easily could

find that the defendants came to the meeting intending to

consummate a deal with the two government agents.

The fact that the final details -- the time and location of

the transaction -- were not set until after the meeting does not

-7-

undermine the jury's conclusion that a conspiracy was formed.

See, e.g., United States v. Iennaco, 893 F.2d 394, 398 (D.C. Cir.

1990) ("There need not be a specific agreement as to price,

quantity, and time, place and manner of delivery.") Indeed, the

evidence permitted the jury to find that Andreoni and Argencourt

consulted and agreed upon those details during a conversation the

evening before the scheduled August 30 deal. See Supp. App. at

65, 72. The jury also reasonably could have found that the

admittedly cautious Argencourt arrived at the scene of the

planned transaction at the designated time but decided against

making the delivery because he detected something amiss.

This case is unlike Iennaco, heavily relied upon by

Argencourt, where the court reversed a conspiracy conviction

because it found only "various unaccepted offers and much

tentative talk," 893 F.2d at 398. The defendants here discussed

with the interested purchasers a specific one-kilogram, $28,000

cocaine deal that was to take place on a particular day.

Subsequent actions and statements by the two defendants confirmed

-- or so the jury could have found -- that deal. We consequently

find no basis for disturbing the jury's verdict on the conspiracy

count.1

III.

1 For the same reasons, we affirm the district court's denial of
Argencourt's motion for new trial. See United States v.

Rothrock, 806 F.2d 318, 321-22 (1st Cir. 1986) (disposition of

new trial motion will not be disturbed on appeal "unless the
court abused its discretion or misapplied the law").

-8-

Andreoni also challenges the sufficiency of the evidence

supporting his conviction on Count 2 for attempt to distribute

cocaine. To prove attempt, the government must establish both an

intent to commit the substantive offense and a "`substantial step

towards its commission,'" United States v. Chapdelaine, No. 92-

1358, slip op. at 10 (1st Cir. March 25, 1993) (quoting United

States v. Figueroa, 976 F.2d 1446, 1459 (1st Cir. 1992)). This

step must be "`more than mere preparation'" but "`less than the

last act necessary before the actual commission of the

substantive crime,'" Chapdelaine, slip op. at 10 (quoting United

States v. Manley, 632 F.2d 978, 987 (2d Cir. 1980)).

The evidence described in the preceding section adequately

establishes Andreoni's intent to commit the substantive crime.

We think it beyond debate that he also engaged in the substantial

step necessary to corroborate his intent. After arranging the

meeting at the restaurant on August 26, Andreoni nailed down the

details of the transaction in a conversation with Argencourt and

communicated the information to Brotan and Vermyea. Andreoni

hooked up with the two government agents at the appointed time,

and waited for a substantial period with them for Argencourt's

arrival. He called Argencourt's office in an effort to find out

about the delay. The jury reasonably could have found that

Andreoni had taken the transaction to the brink of completion,

and that it failed to occur only because of Argencourt's last-

minute caution. This certainly was enough to establish an

attempt.

-9-

IV.

Argencourt challenges the district court's denial of his

mid-trial motion for severance, which was based on the

introduction of evidence of other crimes committed by Andreoni.

The evidence at issue concerned Andreoni's solicitation of arson.

Andreoni's lawyer initially elicited testimony about arson from

Agent Brotan in an effort to develop the defense theory that

Andreoni had pretended to comply with Brotan and Vermyea's plans

because he feared they would harm or kill his family. Through

his cross-examination, the lawyer established that Brotan and

Vermyea had portrayed themselves as dangerous individuals willing

to commit violent acts, and that Vermyea had told Andreoni that

burning buildings was his specialty. Tr. Vol. I at 79, 89-90.

On redirect, the prosecutor asked Brotan about the arson

discussions he had had with Andreoni. Brotan testified that

Andreoni had suggested that Brotan and Vermyea might be hired to

burn both a Providence restaurant belonging to Andreoni's brother

and the house of an attorney whose wife had been awarded the home

in a divorce settlement. According to Brotan, Andreoni had

indicated that it did not matter if the wife was in the house at

the time it was burned.

Argencourt's severance motion was premised entirely on this

arson testimony. See Tr. Vol. I at 162.2 The court's decision

to deny the motion is reversible only upon a strong showing of

2 The trial also included testimony about other criminal conduct
by Andreoni, see Section V infra, but the severance motion made

reference only to the arson activity.

-10-

prejudice, demonstrating a manifest abuse of discretion that

denied the defendant a fair trial. See United States v. Olivo-

Infante, 938 F.2d 1406, 1409 (1st Cir. 1991); United States v.

Boylan, 898 F.2d 230, 246 (1st Cir. 1990).

Argencourt has not met this standard. As an initial matter,

his attorney failed to object to Brotan's testimony when it was

given. This fact was noted by the district court, see Tr. Vol. I

at 162, and, in our view, suggests that the evidence had less-

than-monumental significance to Argencourt's case. More

importantly, the lawyer did cross-examine Brotan at some length

for the purpose of establishing that Argencourt was not involved

in Andreoni's other criminal activities, including arson, and the

agent's testimony unequivocally excluded Argencourt from those

crimes. See Tr. Vol. I at 101-02. The record thus provides no

basis for a finding of prejudice. Consquently, we affirm the

district court's denial of Argencourt's severance motion.

V.

Andreoni claims that the district court erred by allowing

into evidence testimony concerning his efforts to obtain firearms

for Brotan and Vermyea. We think it apparent that the testimony

had a reasonable connection with issues in the case and, given

its relevance, the district court's weighing of the value of the

evidence against its prejudicial effect fell within the trial

judge's discretion. See United States v. Spinosa, 982 F.2d 620,

628 (1st Cir. 1992) (admission of prior bad acts evidence is

reviewed only for abuse of discretion).

-11-

It is well established that, under Fed. R. Evid. 404(b),

evidence of prior bad acts is not admissible to show bad

character or propensity to commit a crime, but may be admitted

when it has some "special," non-character based relevance.3

United States v. Arias-Montoya, 967 F.2d 708, 709 (1st Cir.

1992). In this case, a primary defense theory was that Andreoni,

throughout his relationship with the government agents, was

merely puffing, making wild and unfounded promises that he had no

ability or intention to fulfill. Andreoni wanted the jury to

believe that the proposed cocaine deal was no more than big talk

by an expert bragger.

Evidence that Andreoni did follow through on obtaining guns

for Brotan and Vermyea strikes at the heart of this theory and,

consequently, had significant probative value for a purpose other

than showing criminal propensity. See Figueroa, 976 F.2d at 1454

(other acts evidence admissible to corroborate matters

significant to the prosecution's case). Our caselaw establishes

that such evidence is admissible unless its value is

"substantially outweighed" by the risk of unfair prejudice,

confusion, or waste of time. See, e.g., Arias-Montoya, 967 F.2d

at 710; Fed. R. Evid. 403. No such imbalance occurred here.

Although the evidence certainly was prejudicial, nothing about it

3 Fed. R. Evid. 404(b) states that "[e]vidence of other crimes,
wrongs, or acts is not admissible to prove the character of a
person in order to show action in conformity therewith. It may,
however, be admissible for other purposes, such as proof of
motive, opportunity, intent, preparation, plan, knowledge,
identity, or absence of mistake or accident . . . ."

-12-

was unfairly so. See Spinosa, 982 F.2d at 628. The jury knew,

from other testimony, that Andreoni was involved in criminal

activities other than the alleged cocaine dealing. Moreover,

when the firearms evidence first was elicited from Brotan, the

district court gave a limiting instruction advising the jury that

it was admissible "only for the purpose of disclosing what

relationships were between the parties . . . ." See Tr. Vol. I

at 99.4 We therefore reject this claim of error.5

VI.

During deliberations, the jurors asked to rehear the tape

recording of the conversation that took place on August 26 among

the defendants and the two government agents. Argencourt argues

on appealthat thedistrict courterred inacceding to theirrequest.6

4 The firearms testimony was elicited twice during the trial,
first from Brotan during redirect examination by the prosecutor
and later from Andreoni when he testified as a defense witness
for Argencourt. When Brotan testified, Andreoni's counsel
objected to the evidence as irrelevant, and it was at that time
that the district court instructed the jury of the limited
appropriate use for the evidence. See Tr. Vol. I at 99. When

the testimony was elicited a second time, from Andreoni, the
attorney raised a specific 404(b) objection. In overruling that
objection, the trial judge noted Andreoni's defense that he was
"play acting." See Supp. App. at 114-15. There was no request

for a limiting instruction at that time, and none was given.

5 In light of our disposition, we do not address the government's
suggestion that Andreoni's 404(b) objection was untimely. Nor do
we consider Andreoni's cursory reference to the government's
failure to give pretrial notice of its intent to use the firearms
evidence. This issue was neither raised below nor briefed
meaningfully on appeal.

6 The tape recording for August 26 was introduced into evidence
in two parts. One cassette contained a recording of the two-
minute interval between the time the recorder was activated in
the parking lot of the restaurant and the beginning of the
conversation inside the restaurant. The other tape contained the

-13-

We repeatedly have held that the decision to reread or

replay testimony during jury deliberations rests in the sound

discretion of the district court. See United States v. Akitoye,

923 F.2d 221, 226 (1st Cir. 1991) (citing cases). The factors to

be considered are "the reasonableness of the request, the ease or

difficulty in compliance, and what is likely to be gained or

lost." Id.

With these factors in mind, there is no doubt that the

district court acted well within its discretion. The jury's

request was specific and easy to accommodate. The conversation

the jury sought to revisit was the most significant piece of

evidence presented by the prosecution, particularly against

Argencourt, and providing the jury with a second chance to digest

it strikes us as fully appropriate. Indeed, the jurors' desire

for a repetition is likely to reflect an appropriate concern that

the conversation be evaluated as carefully as possible. We see

no likelihood that the jury gave it undue emphasis.

VII.

Both defendants argue that the district court erred in

calculating their offense levels based on one kilogram of

cocaine. Although they do not dispute that one kilogram was the

conversation. Both tapes had been played for the jury, and the
court ordered that both be replayed in response to the jury's
request during deliberations.
Although his brief is unclear, we believe Argencourt intends
on appeal to challenge the replaying of both tapes. Regardless,
we see no need to dwell on this ambiguity or to delve into the
issue of waiver, raised by the government, because we think it
manifest that the court acted properly. See infra.

-14-

amount negotiated,7 they claim that there was insufficient

evidence that they were capable of actually producing such a

large quantity of the drug. Under the Sentencing Guidelines,

they assert, the amount of drugs involved in an uncompleted

transaction may be considered only if the evidence shows the

defendants intended to produce, and were reasonably capable of

producing, that amount. See U.S.S.G. 2D1.1, comment. (n.12).8

This argument has some facial appeal because, as Andreoni

argues, "during the entire transaction, no drugs were seized, no

samples were given, no money exchanged for drugs and no

distribution of drugs was made." Brief at 27. Andreoni had no

history of drug dealing and Argencourt stated during the August

26 meeting that he had been out of the business for some time.

The claim fails upon closer scrutiny, however, because it

is, in essence, simply a reiteration of the sufficiency of the

evidence argument. Although the defendants claim that the one-

kilogram amount used by the district court is too high, they do

7 Andreoni explicitly acknowledges that one kilogram was "the
negotiated amount of drugs," see Brief at 26. Argencourt makes

no argument that the government or court misunderstood the amount
being discussed in the tape-recorded conversations.

8 The note states, in pertinent part:

[W]here the court finds that the defendant did not
intend to produce and was not reasonably capable of
producing the negotiated amount, the court shall
exclude from the guideline calculation the amount that
it finds the defendant did not intend to produce and
was not reasonably capable of producing.

Until November 1992, when the Guidelines were amended, this
statement appeared in 2D1.4, comment. (n.1).

-15-

not say what amount the district court properly could have used

for calculating their offense levels. In our view, their

objection is really to the jury's finding of guilt, and to the

court's endorsement of it through sentencing.

This is not to say that a finding of guilt in a conspiracy

case, by itself, binds a court to the amount explicitly

negotiated by the defendants. A jury's supportable guilty

verdict may establish that the defendants intended to produce the

quantity at issue, which in turn is at least some evidence of a

capacity to produce it. It is not, however, conclusive.

Application note 12 permits the court to hold the defendants

responsible for a lesser quantity, notwithstanding their specific

negotiations, if the court is unpersuaded that the defendants

actually intended and could have provided the full amount.

The application note does not help defendants in this case

because the evidence suggests the capacity, as well as the

intent, to sell one kilogram of cocaine. The taped negotiations

demonstrated the defendants' knowledge about the drug trade and

revealed that Argencourt had significant past narcotics

experience. See Supp. App. at 33-36. Andreoni's efforts to

obtain firearms for the agents suggested real criminal-world

connections. In accepting the one-kilogram amount as a realistic

reflection of the defendants' culpability, the district court

relied specifically on the fact that Argencourt, at the time of

-16-

this offense, was out on bail on state drug charges.9 That the

state charges involved significantly smaller amounts of cocaine

than the one kilogram does not undermine the crucial fact of

prior access to the drug. These circumstances taken together

amply support the district court's finding that defendants

intended to provide, and were capable of providing, the

negotiated amount of cocaine. See United States v. McCarthy, 961

F.2d 972, 978 (1st Cir. 1992) (sentencing court's determination

of drug amount reviewed only for clear error).10

Thus, this claim, like the others, is unavailing.

Affirmed.

9 According to Argencourt's presentence report, the incidents
underlying the state charges occurred in November 1990 when,
under surveillance by Pawtucket police, a confidential informant
made three purchases of cocaine from him. Two counts alleging
delivery of cocaine ultimately were dismissed, and he was
sentenced on a single count of possession of a controlled
substance.

10 The circuits have not been uniform in their treatment of
application note 12. A conflict exists over whether the
government bears the burden of showing intent and capacity, or
whether the defendant bears the burden of showing a lack of
intent and capacity, see United States v. Barnes, 1993 U.S. App.

LEXIS 11153, at *5-9 (9th Cir. May 17, 1993) (citing cases), and
some confusion exists over whether the court is required to
exclude a negotiated amount only where the defendant lacked both

the intent and the ability to complete the drug transaction, see

United States v. Brooks, 957 F.2d 1138, 1151 & n.11 (4th Cir.

1992). These issues were neither raised nor of significance
here. Even assuming the government had the burden, the evidence
was sufficient to support the district court's finding that
defendants intended and could produce the negotiated amount of

cocaine.

-17-