**UNITED STATES, Appellee,**

v.

**Eusebio ESCOBAR–DE JESUS, Defendant, Appellant.**

**No. 93–1608.**

United States Court of Appeals, First Circuit.

Heard Oct. 5, 1999.

Decided Aug. 2, 1999.

Rachel Brill for appellant.

Thomas M. Gannon, attorney, Department of Justice, with whom Guillermo Gil, United States Attorney, and Jorge E. Vega–Pacheco, Assistant United States Attorney, were on brief for appellee.

Before BOUDIN, Circuit Judge, REAVLEY, Senior Circuit Judge,* and LIPEZ, Circuit Judge.

LIPEZ, Circuit Judge.

This case involves a large drug trafficking organization that imported cocaine from Colombia and distributed it in Puerto Rico and New York from 1986 until 1990. In April 1991, as the climax of a lengthy investigation, a federal grand jury returned a thirty-four count superseding indictment charging defendant-appellant Eusebio Escobar-de Jesús ("Escobar") and seventeen other individuals not parties to this appeal with various drug-related offenses. In April 1993, a jury convicted Escobar of sixteen drug, assault, and weapons-related counts, including Count 1, engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(a) & (c), and Count 12, causing an intentional killing while engaged in a continuing crimi-

* Of the Fifth Circuit, sitting by designation.

nal enterprise in violation of 21 U.S.C. § 848(e).[1] This appeal followed, the disposition of which was deferred pending the Supreme Court's decision in *Richardson v. United States*, —— U.S. ——, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999), on juror unanimity requirements applicable to a continuing criminal enterprise charge. After careful consideration of the record and Escobar's many arguments on appeal, we affirm all of the convictions.

## I. Background

We recite the facts in the light most favorable to the verdicts, consistent with support in the record. *See United States v. Rodriguez*, 162 F.3d 135, 140 (1st Cir. 1998). We summarize below the facts presented during the trial, providing additional details as they become relevant to the discussion.

### The March 26, 1986 Lajas Incident

Largely through the testimony of cooperating co-defendant Edwin Soto–Osorio ("Soto"), the government established that on March 26, 1986, Escobar directed Soto and co-defendants Florentino Rivera–Mojica ("Rivera") and Antonio Santos–Caraballo ("Santos") to accompany him to a dirt road in the middle of a sugar cane field in Lajas to meet a plane containing cocaine from Colombia. To demarcate the makeshift landing strip, the men placed white lights along the beginning of the road and yellow lights along the end of the road. The lights were powered by a car battery. After the plane crash-landed, the four men and several other individuals associated with Escobar retrieved much of the plane's drug cargo and transported it to nearby Loíza. Following the departure of Escobar and his associates, law enforcement officers arrived at the scene of the crash and discovered cocaine in the plane.

### The April 14, 1986 Shooting of Customs Agents

On April 14, 1986, co-defendant Eric Flores–Rivera ("Flores") drove a yellow truck to the Isla Grande airport and obtained more than one hundred gallons of aviation gasoline. Surveilling agents then observed Flores drive the yellow truck into the Potrero Cuevas Farm ("the farm") near Carolina. An agent also observed a blue truck driven by co-defendant Andrés Morales–Cruz ("Morales") enter the farm. Waiting outside the farm, agents heard a plane flying overhead. Shortly thereafter, agents observed the yellow truck, a white van, and a blue truck driven by Escobar and carrying six passengers (four dressed in camouflage) leave the farm. Two of the surveilling agents followed the white van to a nearby town, where the van suddenly reversed direction and its occupants opened fire on the agents. Both agents were seriously wounded.

**1.** The complete list of convictions includes: Count 1, engaging in a continuing criminal enterprise in violation of 21 U.S.C. 848(a) & (c); Counts 5 and 6, assaulting Customs Service officers with deadly weapons in violation of 18 U.S.C. § 111(a)(1) & (b); Count 7, possessing a machine gun in violation of 18 U.S.C. § 922(o)(1); Count 10, aiding and abetting the possession of eighty kilograms of cocaine with the intent to distribute it in violation of 21 U.S.C. § 841(a)(1); Counts 11, 17, and 18, aiding and abetting interstate travel with the intent to promote unlawful activity in violation of 18 U.S.C. § 1952; Count 12, causing an intentional killing while engaged in a continuing criminal enterprise in violation of 21 U.S.C. § 848(e); Counts 15 and 16, possessing firearms as a previously convicted felon in violation of 18 U.S.C. § 922(g)(1); Counts 19, 23, 24, and 33, using a communications device to facilitate the importation of cocaine in violation of 21 U.S.C. § 843(b); and Count 20, aiding and abetting an attempt to import 320 kilograms of cocaine in violation of 21 U.S.C. §§ 952, 960, and 963.

The jury acquitted Escobar on Counts 3, 4, and 26, charging him with drug importation, possession, and telephone facilitation offenses. Furthermore, although the jury found Escobar guilty on Count 2, conspiring to import and to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 846 and 963, the district court vacated the conviction on Double Jeopardy grounds. *See, e.g., United States v. Rivera–Martinez*, 931 F.2d 148, 152–53 (1st Cir.1991).

In the days following the shootings, agents searched the vicinity of the farm and discovered a clandestine landing strip made of dirt. They also found, *inter alia,* twenty heavy-duty lamps that had been purchased by Escobar, batteries, and a string that had been stretched along the makeshift landing strip. Escobar's fingerprints were on one of the lamps, and more than sixty gallons of the aviation fuel which had been brought to the farm by Flores were gone. Agents found the white van used in the shooting in the Loíza River on April 16.

### The November 1989 Intercepted Cocaine Shipment

In 1989 federal authorities began an investigation of Escobar that included court-ordered electronic surveillance and the use of a confidential informant named William Cedrés. In order to infiltrate Escobar's organization, Cedrés began managing a Loíza grocery store and bakery, and, through his acquaintances with co-defendants Rivera and Héctor Ríos–Velásquez ("Ríos"), was introduced to Escobar. Through his infiltration of Escobar's organization, Cedrés learned that Escobar directed an organization of at least fourteen members.[2]

In early November 1989, Escobar and Rivera made plans to deliver a shipment of cocaine from Puerto Rico to New York on a commercial airlines flight. Cedrés expressed interest in participating in the delivery, and Escobar agreed. On November 21, co-defendant Fernando Faccio–Laboy ("Faccio") delivered eighty kilograms of cocaine to Escobar, who in turn delivered the cocaine to Cedrés in five suitcases. Rivera and Cedrés placed official · inspection seals from the United States Department of Agriculture on the five suitcases and presented them at the

check-in counter at the airport. Rivera and Cedrés boarded the flight, but the suitcases were seized upon arrival in New York by federal authorities. Rivera called Escobar in Puerto Rico to report the situation.[3] Escobar later met with Faccio and a representative of the Ochoa family, part of Colombia's Medellín cartel, to discuss the lost cocaine.

### December 1989: Planning for Future Importations

In December 1989 Escobar began to plan additional importations of cocaine from Colombia to Puerto Rico. On December 9 and December 13, Escobar and several subordinates traveled to Vieques, Puerto Rico, to inspect potential sites for clandestine airstrips to use in importing approximately 1,500 kilograms of cocaine from the Medellín and Cali cartels in Colombia. On or about December 20, Escobar and his subordinates also discussed the possibility of using a plane to drop the cocaine into the ocean near Guánica, where it would be picked up by speedboats directed by co-defendants Soto and Santos. During the month of December 1989 Escobar also discussed cocaine importation with José Alberto Ochoa–Vasco ("Ochoa"), a representative of the Medellín cartel.

### The Murder of Martín Matos–Cruz

According to Cedrés's testimony, in December 1989 Escobar asked him to kill Martín Matos–Cruz ("Matos"), who was the third-ranking member of Escobar's organization and had fallen out of favor with Escobar. On January 2, 1990, however, Escobar told Cedrés that he had found another person, co-defendant Michael Cruz–González ("Cruz"), to kill Matos. The same day, Escobar and Cruz traveled to Carolina to identify Matos's residence,

---

**2.** Cedrés testified that Escobar was "the top man, the person who would plan, the person who would organize and the person who would order all aspects of the organization."

**3.** After losing the New York cocaine shipment in November 1989, Rivera, who had been Escobar's second-in-command, fell out of favor with Escobar. In mid-January 1990 Escobar asked Cedrés to become his second-in-command.

and on January 3, according to Cedrés's testimony, Cruz shot and killed Matos outside Matos's residence.[4] On January 5, at Escobar's request, Cedrés gave Cruz $1,500 as a partial payment for the murder.

### The March 1990 Attempted Importation

Throughout January and February 1990, Escobar and his confederates continued to plan drug importations, meeting at least fifteen times to discuss the logistics of the effort. Between March 5 and March 13, Escobar was in repeated telephone contact with several individuals, including Soto, regarding an anticipated cocaine delivery. On March 13, Escobar and his men attempted to import 320 kilograms of cocaine by air, but the flight was intercepted by Coast Guard and Customs Service aircraft, causing it to break off and return to Colombia.

Following this aborted importation, Escobar and his confederates continued to meet during March and April to discuss other ways to successfully import cocaine to Puerto Rico. On April 2, Mesa informed Escobar by telephone that a shipment of cocaine was ready for delivery and that he should arrange to receive it. Shortly thereafter, however, Escobar entered a drug rehabilitation program in order to avoid revocation of his parole. Cedrés replaced him in meetings with representatives of the Medellín and Cali cartels, and kept Escobar informed of developments. On April 8, Cedrés and Flores met Escobar at the drug rehabilitation facility to discuss arrangements for the importation. Before the importation could be executed, however, Escobar was arrested.

---

4. The jury acquitted Cruz of Matos's murder.

5. 21 U.S.C. § 848(e)(1)(A) provides in pertinent part:
 (e) Death penalty
 (1) In addition to the other penalties set forth in this section -
 (A) any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of

## II. The Jury Instructions

### A. Continuing Criminal Enterprise

Section 848, often referred to as the "kingpin" statute, makes it a crime to engage in a "continuing criminal enterprise." The statute provides:

[A] person is engaged in a continuing criminal enterprise if-

(1) he violates any provision of [the federal drug laws, i.e.,] this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is part of a continuing series of violations of [the federal drug laws, i.e.,] this subchapter or subchapter II of this chapter -

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer [or supervisor or manager] and

(B) from which such person obtains substantial income or resources.

21 U.S.C. § 848(c). In this case, the jury convicted Escobar of Count 1, charging that he had engaged in a continuing criminal enterprise ("CCE") from on or about April 1986 until the date the indictment was filed, in violation of 21 U.S.C. § 848(a) & (c); and of Count 12, charging that he had caused the killing of Martín Matos–Cruz while engaged in the CCE, in violation of 21 U.S.C. § 848(e)(1)(A).[5]

On appeal Escobar argues that the district court erred in failing to grant his proposal to instruct the jurors that, in

---

this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death; . . . .
21 U.S.C. § 848(e)(1)(A).

order to convict under section 848, they must agree unanimously on which underlying violations—of the ten alleged [6]—constituted the three related violations necessary to establish a "continuing series." [7] *See United States v. Chagra,* 653 F.2d 26, 27–28 (1st Cir.1981) (noting that other courts have required at least three violations for a "continuing series"). Although recent Supreme Court authority confirms that the district court did err, we conclude that the error in this case was harmless.

In *Richardson v. United States,* —— U.S. ——, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999), the Supreme Court addressed the question whether a jury must agree unanimously about which specific predicate violations make up the "continuing series of violations." That question turned on whether the existence of a "series" is itself a single element, as to which the violations are merely underlying "brute facts" not requiring juror unanimity, or whether the individual violations in that series are themselves elements of the offense. *See id.* 119 S.Ct. at 1710. Under the former interpretation, jurors, in order to find that a defendant committed a "continuing series of violations" within the meaning of section 848, would need to agree unanimously only that the defendant had engaged in a continuing series of at least

6. We arrive at the number ten after having done our best to untangle the discrepancies between the indictment and the court's jury instructions concerning which separately charged offenses could be considered as predicate violations, and after sorting through problems in the indictment itself (none of which are raised by Escobar on appeal and are therefore deemed waived). Specifically, Count 1 of the indictment (the CCE count) alleges that the following separately charged offenses could serve as predicate offenses: Count 2 (conspiracy); Count 3 (the April 1986 importation); Count 4 (the April 1986 possession with intent to distribute); Counts 8 and 9 (charging co-defendant Faccio with drug-related offenses); Count 10 (the November 1989 possession with intent to distribute); Counts 11 and 18 (charging Escobar with aiding and abetting his co-defendants' illegal interstate travel in violation of 18 U.S.C. § 1952); Counts 19, 23, 24, and 26 (telephone facilitation); Counts 21 and 22 (charging Escobar and co-defendants with weapons offenses); and Counts 25 and 27–31 (charging Escobar's co-defendants with drug-related offenses).

In its instructions to the jury concerning which separately charged offenses it could consider as predicate violations for the purposes of the CCE count, the district court omitted several of the counts listed above (namely, counts 21 and 22, which were dismissed, and counts 25 and 27–31). It also included several counts that, although listed in Count 1 as underlying violations, could not have served as underlying violations because they did not arise under U.S.Code 21, Title 13, subchapters I or II (namely, counts 11 and 18). Additionally, the court included Count 33 (charging Escobar and a co-defendant with telephone facilitation) as a possible predicate violation for the jury to consider, even though it was not identified as such in

the indictment's CCE count. Finally, the court included Counts 8 and 9 as possible predicate violations for the jury to consider, even though those counts had been dismissed upon the motion of the government.

Accordingly, by our calculations, the jury had before it ten possible predicate violations on which it might properly base a CCE conviction: Counts 2, 3, 4, 10, 19, 20, 23, 24, 26 and 33. The jury convicted Escobar on Counts 10, 19, 20, 23, 24, and 33, but acquitted him on Counts 3, 4, and 26. Furthermore, as noted previously, *see supra* note 1, the jury's conviction on Count 2 (the conspiracy count) was vacated by the court on Double Jeopardy grounds.

7. At trial, the district court instructed the jury concerning the CCE count in pertinent part as follows:

In order to prove the allegations of [the CCE count], ... the government must prove the following five essential elements beyond a reasonable doubt: (1) That the defendant committed a felony violation of the federal narcotics laws; (2) Such violation was part of a continuing series of related violations of the federal narcotics laws; (3) The continuing series of violations was undertaken by [Escobar] in association or concert with five or more other persons; (4) [Escobar] was an organizer of these five or more other persons or occupied a management or supervisory position with respect to these five or more other persons; (5) [Escobar] obtained substantial income or resources from the continuing series of narcotics violations.... A continuing series of violations which I also mentioned means three or more violations of the federal narcotics laws, which are in some way related to one another.

three violations; individual jurors would be free to find that continuing series based on the same, overlapping, or entirely different violations. *See id.* Thus, under this theory, a defendant could be convicted of the CCE offense even if jurors could not agree unanimously that the defendant committed any of the alleged violations. For example, half of the jurors might find that offenses A, B, and C, but no others, were committed and constituted a continuing series, and the other half of the jurors might find that offenses D, E, and F, but no others, were committed and constituted a continuing series.

■ Relying on considerations of language, tradition, and potential unfairness, the Supreme Court rejected the notion that the "violations" referred to in section 848 are simply fungible means of satisfying the "series" element of section 848. *See id.* at 1709–13. Rather, the Court held that those "violations" are themselves elements of the offense, meaning that jury unanimity in respect to each individual violation is necessary. *See id.* Accordingly, in cases where the government introduces evidence that the defendant has committed more underlying drug crimes than legally necessary to make up a "series," *Richardson* requires that they agree unanimously about which crimes make up the continuing series. *See id.* at 1709.

■ In light of *Richardson*, the government concedes that the district court erred by failing to instruct the jurors that the "violations" are themselves elements of the CCE offense and that they therefore must agree unanimously about which three (or more) drug crimes the defendant committed. The government argues, however, that the court's error was harmless because the jury separately convicted Escobar of Counts 10, 19, 20, 23, 24, and 33, which were six of the ten predicate offenses alleged to constitute the series. *See supra* note 6. Thus, the government observes, the jurors must have unanimously agreed that Escobar committed six of the alleged violations, which was more than

enough to constitute a "series." *See Chagra,* 653 F.2d at 27–28.

■ We have previously recognized that some uncertainty exists about whether a jury instruction that misdefines or omits an element of the offense charged is susceptible to harmless error review. *See United States v. Marder,* 48 F.3d 564, 573 (1st Cir.1995); *United States v. Whiting,* 28 F.3d 1296, 1309, 1309 n. 12 (1st Cir. 1994) (collecting cases). The Supreme Court recently addressed this question in *Neder v. United States,* —— U.S. ——, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), in which the Court ruled that the trial court's omission during its jury instructions of an essential element of the offense charged (namely, the materiality element of a tax offense) is subject to harmless error review. *See id.* 119 S.Ct. at 1833–36. In *Neder,* the Court observed that an error is "structural," and therefore not subject to harmless error review, only in a " 'very limited class of cases,' " *id.* 119 S.Ct. at 1833 (quoting *Johnson v. United States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)), and that it had on many occasions applied harmless error analysis to cases involving improper instructions on a single element of the offense, *see id.* 119 S.Ct. at 1834 (citing *Yates v. Evatt,* 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991) (mandatory rebuttable presumption); *Carella v. California,* 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989) (per curiam) (mandatory conclusive presumption); *Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987) (misstatement of element); *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (mandatory presumption)). Such omissions, the Court stated, "differ[ ] markedly from the constitutional violations we have found to defy harmless-error review," such as the complete denial of counsel or trial before a biased judge. *Id.* 119 S.Ct. at 1833. Accordingly, where a court omits or misdescribes an essential element of the offense, as happened here by the court's failure to

instruct the jury that the "violations" were themselves elements of the CCE crime and that they therefore must agree unanimously which violations make up the "continuing series," the conviction must nonetheless be affirmed if the reviewing court can conclude beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. *See id.* at 1838.

In this case, the jury's decision to convict Escobar on Counts 10, 19, 20, 23, 24, and 33—which were alleged to be predicate violations supporting the CCE count—necessarily establishes that the jurors agreed unanimously that he was guilty of those offenses. This decision ensures that the concern at the core of the *Richardson* decision—namely, that jurors might convict a defendant of a CCE on the basis of violations for which there was non-unanimity—is not present. The guilty verdicts on Counts 10, 19, 20, 23, 24, and 33 are tantamount to the jury having found that he committed each of these violations for the purposes of the CCE count.

■ That is not the end of the matter, however. Section 848 also requires that jurors agree that the "series" of violations be "continuing" in nature—that is, that they be related to each other in some way. *See United States v. Edmonds,* 80 F.3d 810, 814 (3d Cir.1996) (citing *United States v. Jones,* 801 F.2d 304, 307 (8th Cir.1986); *United States v. Baker,* 905 F.2d 1100, 1104 (7th Cir.1990)). Although the guilty

verdicts on Counts 10, 19, 20, 23, 24, and 33 erase as a matter of logic any concern that the jury did not agree that Escobar actually committed the offenses making up the series, we can affirm the CCE convictions only if we can conclude beyond a reasonable doubt that the jury, had it been properly instructed, would have found that at least three of those counts were related to each other.

■ The evidence introduced to support the separate convictions on those counts also establishes inescapably their relatedness. The counts involved Escobar's ongoing and persistent efforts to import and distribute cocaine over a finite period of time in late 1989 and early 1990. After the failed importation attempt in late 1989 (Count 10), Escobar re-grouped and tried again in March 1990 (Counts 19, 20, 23, and 24). After failing once again in March, he began planning for another attempt in April 1990 (Count 33). The relatedness of the counts is demonstrated by their proximity in time and identity of purpose, and we conclude beyond a reasonable doubt that the jury, had it been properly instructed, would have found that the counts were "continuing" in nature. *See id.* at 825; *United States v. King,* 169 F.3d 1035, 1041 (6th Cir.1999). Accordingly, we conclude that the court's refusal to instruct the jurors that they must agree unanimously about which violations make up the "continuing series" of violations, within the meaning of section 848(c)(2), was harmless.[8]

**8.** We note that *Richardson* raised but left unresolved an arguable implication of that decision. Specifically, the *Richardson* Court left open the question whether the particular agreed-upon violations making up the continuing series must provide the basis for satisfying section 848's remaining elements— namely, that a defendant have acted in concert with and have supervised, organized, or managed at least five persons, and that he have derived substantial income or resources. *See id.* 119 S.Ct. at 1713 (noting that section 848's other elements "must be satisfied with respect to the series, which, *at a minimum,* permits the jury to look at all of the agreed-upon violations in combination") (emphasis

added); *see also id.* at 1716 (Kennedy, J., dissenting) (arguing that "the necessary consequence of the Court's ruling is that the three specific crimes must themselves be the ones, in the words of the statute, 'from which [the accused] obtains substantial income or resources' "). Escobar does not ask us to resolve this unanswered question presented by the *Richardson* decision, and we leave the matter for another day. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990) (arguments not raised on appeal are deemed waived).

Furthermore, as noted previously, *see supra* note 6, Count 2 (alleging that he and his

### B. The Telephone Facilitation Counts

■ Escobar also argues that the district court erred in its instructions to the jury on three telephone facilitation counts, which charged him with using a telephone in facilitating the importation of cocaine in violation of 21 U.S.C. § 843(b).[9] Specifically, Escobar contends that the district court should have expressly instructed the jury that in order to convict under section 843(b), it had to find that the underlying drug offenses alleged to have been facilitated by his telephone use—namely, the importations—were actually committed. Because Escobar did not object to the district court's instructions during the trial and raises this issue for the first time on appeal, we review only for plain error. *See* Fed.R.Crim.P. 52(b); *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

The federal courts have uniformly held that, to obtain a conviction on a charge of telephone facilitation pursuant to section 843, the government must prove commission of the underlying offense. *See United States v. Iennaco*, 893 F.2d 394, 396–97 (D.C.Cir.1990); *United States v. Dotson*, 895 F.2d 263, 264 (6th Cir.1990)(citing *United States v. McGhee*, 854 F.2d 905, 908 (6th Cir.1988)); *United States v. John-*

*stone*, 856 F.2d 539, 543 (3d Cir.1988); *United States v. Mims*, 812 F.2d 1068, 1077 (8th Cir.1987); *United States v. Russo*, 796 F.2d 1443, 1463–64 (11th Cir.1986); *United States v. Rey*, 641 F.2d 222, 224 n. 6 (5th Cir.1981); *United States v. Webster*, 639 F.2d 174, 189 (4th Cir.1981); *United States v. Watson*, 594 F.2d 1330, 1342–43 (10th Cir.1979); *United States v. Steinberg*, 525 F.2d 1126, 1133–34 (2d Cir.1975). But Escobar's challenge, though predicated on section 843(b)'s requirement that the underlying drug offense have been committed, is more specific: he assigns error to the district court's failure to expressly charge the jury regarding this requirement (over and above recitation of the statutory language). On this narrower instructional point, there is little authority. Indeed, we have discovered only one case that has addressed whether a district court must instruct the jury in the manner urged by Escobar. *See Dotson*, 895 F.2d at 263 (holding that the district court should have expressly charged the jury that it had to find underlying crimes were actually committed, but concluding that the court's error was harmless).

Although the language of section 843(b) itself arguably conveys without any need for elaboration the requirement of a jury finding that the underlying drug offense

co-defendants conspired to import and possess cocaine with the intent to distribute, and listing 102 alleged overt acts) was also identified as a predicate violation in the indictment and the jury instructions. The jury convicted Escobar on Count 2, but the district court properly vacated both the conviction and the sentence on Double Jeopardy grounds. *See Rutledge v. United States*, 517 U.S. 292, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996) (because conspiracy is a lesser-included offense of the CCE, Double Jeopardy clause's prohibition on multiple punishments for the same offense mandates vacation of the conspiracy conviction and sentence); *United States v. Rivera–Martinez*, 931 F.2d 148, 152–53 (1st Cir.1991) (same). In making its harmless error argument, the government does not discuss Count 2 (although it does rely on Count 2 in responding to Escobar's sufficiency challenge, *see infra* note 24 and accompanying text). Even if the con-

viction on Count 2 was included in the harmless error analysis, the outcome of that analysis does not change. The jury made the unanimous finding of guilty on the conspiracy count. The conspiracy conviction is inescapably related to the other predicate offenses. For the reasons noted in the preceding paragraph, we do not address any other elements of the CCE convictions as part of the harmless error analysis.

9. 21 U.S.C. § 843(b) provides in pertinent part:

It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter [i.e., the federal drug laws].

was committed, we agree that an instruction would have clarified any potential ambiguity in section 843(b)'s language on that point. *See id.* at 264. However, given the scarcity of authority mandating such an instruction, combined with the nature of the alleged instructional error,[10] we cannot conclude that any error in the court's instructions was "plain," *see Olano,* 507 U.S. at 734, 113 S.Ct. 1770 (for the purposes of Rule 52(b), the word "plain" is synonymous with "clear," or, equivalently, "obvious"), or that it affected Escobar's substantial rights or denigrated the judicial proceedings, *see Johnson,* 520 U.S. at 467, 117 S.Ct. 1544.

### III. The Jury Selection

We next consider Escobar's *Batson*-based claim that his convictions must be vacated because of deficiencies in the jury selection process. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). His argument, although difficult to parse, appears to be two-pronged. First, he contends that the district court's conclusion that he failed to establish a prima facie case of discrimination in the government's use of its peremptory strikes was clearly erroneous. Alternatively, he says that even if he did fail to establish a prima facie case, the district court's erroneous ruling on voir dire questions made it impossible for him to establish a prima facie case. We disagree with both contentions. During the jury selection process, defense counsel requested the court to order that the government provide race-neutral explanations for its peremptory strikes of two African–American men, contending that these strikes demonstrated a "pattern" of removing African–American men that raised an inference of racial discrimination. The government denied that the strikes were racially

motivated, but did not offer a race-neutral explanation. The court denied Escobar's request, reasoning that six or seven African–American individuals remained in the jury box, where sixteen individuals were seated for the purpose of jury selection and that there was insufficient evidence to establish a "pattern" of strikes.

The three-part framework that must be applied to equal protection challenges to the government's use of a peremptory strike is well established. First, a defendant must make a prima facie showing of discrimination in the government's use of its peremptory strike. *See Batson,* 476 U.S. at 96–97, 106 S.Ct. 1712. If the defendant fulfills this requirement, the government must then proffer a race-neutral explanation for having challenged the juror. *See id.* at 97, 106 S.Ct. 1712. Finally, if the government meets its burden of production by proffering a race-neutral explanation, the district court must then decide whether the defendant has carried the ultimate burden of proving that the government's use of its peremptory strike constituted purposeful discrimination. *See id.; Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). In challenging the government's use of peremptory strikes, the defendant retains the burden of proof throughout. *See United States v. Bergodere,* 40 F.3d 512, 515 (1st Cir.1994).

Although the prima facie case requirement "is not onerous, neither can it be taken for granted." *Bergodere,* 40 F.3d at 516. To satisfy his burden of establishing a prima facie case, Escobar was required to have shown, *inter alia,* "circumstances sufficient ... to raise an inference that the prosecutor struck the venireperson on account of race."[11] *Id.* All relevant

---

10. As the *Dotson* Court observed, the alleged error here would be characterized "as one of ambiguity and incompleteness. This is in contrast to other types of instructional error, where, for example, a trial judge fails completely to instruct on an essential element of

the crime charged, or delivers an instruction that impermissibly shifts the burden of proof to the defendant on an essential element." *Dotson,* 895 F.2d at 264.

11. There is no dispute in this case that the government's challenges were directed at

circumstances are to be considered in determining whether the defendant has established a prima facie case, *see Batson,* 476 U.S. at 96–97, 106 S.Ct. 1712; *Chakouian v. Moran,* 975 F.2d 931, 933–34 (1st Cir.1992), and the district court's ruling on this fact-sensitive question must be upheld unless it is clearly erroneous, *see Bergodere,* 40 F.3d at 516.

Although it is true that a "pattern" of strikes against African–Americans is one circumstance which may raise an inference of discrimination, *see Batson,* 476 U.S. at 97, 106 S.Ct. 1712, the district court's conclusion that the government's two strikes failed to demonstrate such a "pattern" was not clearly erroneous, particularly in light of the court's observation that six or seven African–Americans were seated in the jury box at the time of the strikes and that six or seven African–Americans were eventually selected to serve on the jury.[12] *See, e.g., United States v. Sangineto–Miranda,* 859 F.2d 1501, 1521–22 (6th Cir.1988) (noting that composition of the ultimate jury sworn may be relevant to *Batson* prima facie inquiry). Moreover, Escobar does not suggest, nor do we discern, that the prosecutor's questions and statements during the voir dire examination of potential jurors raise any inference of racially motivated strikes. *See id.* (noting that "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose"). We find no clear error in this case.

Alternatively, Escobar points out that during voir dire he proposed that the district court ask potential jurors questions related to racial bias, which he argued were necessary because Escobar is African–American and because "there is racism in Puerto Rico." The court denied the request, reasoning that there was no indication that racial animosity or racial motive was an issue in the case. Escobar now claims that the court's refusal to question jurors about their potential racial bias hindered his later efforts to establish a prima facie case of discriminatory intent in the government's use of its peremptory strikes to remove the two African–American men during the jury selection process.

To the extent that Escobar does in fact challenge directly the court's denial of his request to question potential jurors about racial prejudice (and it is unclear whether he makes this challenge), we find that the voir dire conducted in this case was sufficient. While the Supreme Court has held that under certain circumstances the possibility of racial prejudice makes special voir dire questioning constitutionally mandated, *see Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) (involving sentencing of black defendant who had been convicted of a capital offense); *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973)(involving black civil rights activist whose defense to drug charge was that he had been framed by white police), voir dire ordinarily need not include questions re-

---

members of a cognizable racial group and that the challenges were peremptory rather than for cause, the two additional factors that must be shown in order to establish a prima facie case of race-based use of peremptory strikes. *See Bergodere,* 40 F.3d at 515–16.

12. Escobar also contends that the court improperly refused to grant a co-defendant's request to "define a criteria" by which to determine whether venirepersons were African–American, and that this refusal made it impossible for him to establish a prima facie case of race-based use of peremptory strikes. We do not read the record to show that the

court refused to define such a set of criteria. Rather, viewed in context, it is clear that the court simply decided that the co-defendant's requested "criteria" were unnecessary, and that if the identification of African–Americans became problematic later in the voir dire process it would reconsider the request. The court's ruling on this matter was well within the bounds of its discretion. Neither Escobar nor his co-defendants renewed the request to define "criteria" by which to determine whether venirepersons were African–American.

garding racial prejudice, *see United States v. Brown*, 938 F.2d 1482, 1485 (1st Cir. 1991). "The mere fact that a defendant is black does not alone trigger the special questioning requirement found in *Ham* and *Turner*." *Id.* Rather, it is "[o]nly when there are more substantial indications of the likelihood of racial or ethnic prejudice" that a trial court is required to ask potential jurors about the issue of racial bias. *Id.* (quoting *Rosales–Lopez v. United States*, 451 U.S. 182, 190, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981)). The only justifications for the special questioning asserted by defense counsel were that his client is African–American and that "racism exists in Puerto Rico." Standing alone, these are not the special circumstances that would require a district court to ask potential jurors if racial prejudice would be a factor in their decision-making process.

Furthermore, we fail to perceive how the district court's refusal to question jurors about racial bias impeded Escobar's ability to establish a prima facie case of discrimination in the government's use of its peremptory strikes, and Escobar does not adequately explain the connection. Even if the court had granted Escobar's request to question potential jurors about racial bias, such questioning would have revealed only the potential *jurors'* racial biases, enabling either party to remove prejudiced jurors for cause. We do not see how such questioning could have shed light on the *government*'s allegedly improper motives for exercising its peremptory strikes, evidence of which was lacking in Escobar's efforts to establish a prima facie case under *Batson*.

■ Finally, Escobar challenges the constitutionality of 28 U.S.C. § 1865(b)(2) & (3), which require that jurors be able to speak the English language and be able to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form. Having previously considered and rejected this contention, *see*

*United States v. Flores–Rivera*, 56 F.3d 319, 326, 326 n. 4 (1st Cir.1995)(citing *United States v. Aponte–Suarez*, 905 F.2d 483, 492 (1st Cir.1990)), we decline to revisit the issue.

## IV. Prosecutorial Misconduct

■ Escobar claims that cooperating co-defendant Soto's testimony created a false impression about the extent to which Soto could benefit from pleading guilty and testifying for the government, and that the prosecutor's failure to correct this misleading testimony resulted in reversible error. We find nothing false or misleading about Soto's testimony.

Before Escobar's trial, Soto entered into a plea agreement which provided, *inter alia*, that he would plead guilty to a drug conspiracy count; that he understood that he may be sentenced to a term of imprisonment not less than ten years; that he acknowledged that the government could move the court to impose a sentence below the sentencing range dictated by the sentencing guidelines based on his substantial assistance; and that if he fully complied with the agreement, the government would not prosecute him for other drug crimes resulting from information provided by him and that the government would move to dismiss the remaining charges against him.

During the trial, Escobar's defense counsel cross-examined Soto about the plea agreement, asking *inter alia* whether Soto was aware that the government had the discretion to move the court to impose a sentence of less than ten years. Soto responded that he was not aware of this; that he expected to receive a sentence of eight to ten years instead of the thirty years to life which would have been imposed if he had not entered into the plea agreement; and that he had discussed the plea agreement with his attorney only in a "overall way" and not "part by part." Escobar now claims reversible error based on Soto's failure to disclose that the government could move the court to impose a

sentence below the statutory minimum and the government's silence on the matter.

 It is true, of course, that the government may not knowingly use false testimony to obtain a conviction, even if the false testimony goes only to a witness's credibility. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (finding due process violation where witness falsely denied that he would receive any benefit from government in exchange for his testimony). In this case, however, Soto's testimony simply cannot be characterized as false or misleading. First, the plea agreement itself simply stated that the government had the discretion to move the court to impose a sentence below the statutory minimum. The government had not promised to file such a motion. Moreover, Escobar points to nothing in the record suggesting that Soto was not truthful about his understanding of the plea agreement and what his sentence was likely to be. When questioned about the numerous benefits he had been promised pursuant to the agreement, Soto testified forthrightly, and there can be little doubt that the jury was presented with sufficient evidence to allow it to make a discriminating appraisal of Soto's motives to testify. *See United States v. Devin*, 918 F.2d 280, 293 (1st Cir.1990).[13]

**13.** Escobar also contends that the government presented materially misleading testimony to the grand jury about informant Cedrés, the government's principal witness. We considered and rejected an identical argument in an appeal brought by Escobar's co-defendant Flores–Rivera. *See United States v. Flores–Rivera*, 56 F.3d 319, 327–28 (1st Cir.1995). We decline to revisit the issue.

**14.** Federal Rule of Evidence 404(b) provides in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.... Fed.R.Evid. 404(b).

## V. Evidentiary Matters

### A. The March 26, 1986 Lajas Incident

Escobar argues that the court erred by allowing the introduction of evidence, including the testimony of co-operating co-defendant Soto, concerning the March 26, 1986 airdrop at Lajas ("the Lajas incident"). Escobar characterizes the Lajas incident as evidence of a prior bad act, and contends that the district court erred by concluding that it was admissible under Fed.R.Evid. 404(b) as proof of the Escobar organization's modus operandi, or, alternatively, as proof of the knowledge and intent of the organization's members to carry out a major drug trafficking scheme.[14]

 The district court's pre-trial order denying Escobar's motion *in limine*, however, did not premise the admissibility of the Lajas incident evidence solely on Rule 404(b) grounds. Rather, the court also ruled that the Lajas incident evidence was not "prior bad act" evidence at all, as the incident fell within the temporal scope of the conspiracy alleged in the indictment and pertained to the same conspiracy alleged in the indictment.[15] Because we agree with the latter theory of admissibility, we need not address the district court's

**15.** Escobar acknowledges in a footnote to his brief that the district court's pre-trial order included the non-Rule 404(b) rationale. However, he contends that "during the trial the Lajas incident was always referred to and treated as 404(b) evidence, indicating that both the government and the district court abandoned any other modality for admission." We are not constrained by the district court's apparent reliance on the 404(b) rationale during the trial. *See United States v. Arboleda*, 929 F.2d 858, 865 (1st Cir.1991) (declining to address district court's 404(b) admission of testimony otherwise properly admissible as direct evidence of the conspiracy charged); *United States v. Tejada*, 886 F.2d 483, 487 (1st Cir.1989) (concluding that ledger was direct evidence of the conspiracy charged and therefore was generally admissible, and declining to address district court's conclusion that the ledger was admissible under Rule 404(b)).

determination that the evidence was admissible under Rule 404(b). *See United States v. Arboleda*, 929 F.2d 858, 865 (1st Cir.1991); *United States v. Tejada*, 886 F.2d 483, 487 (1st Cir.1989).

■ The indictment alleged that the conspiracy began "on or about April 1986." The Lajas incident occurred on March 26, 1986. Given the closeness in time of the Lajas incident to April 1986, we have little difficulty concluding that the Lajas incident is fairly encompassed by the temporal scope of the conspiracy alleged in the indictment. *See United States v. Paredes–Rodriguez*, 160 F.3d 49, 56 (1st Cir.1998) ("reference to approximate dates in an indictment is not binding and thus the scope of the indictment may cover prior events") (citing *United States v. Fisher*, 3 F.3d 456, 461 n. 12 (1st Cir.1993); *United States v. Crocker*, 788 F.2d 802, 805 (1st Cir.1986) ("approximate dates in an indictment are not controlling")); *see also United States v. Morris*, 700 F.2d 427, 429 (1st Cir.1983) ("Where a particular date is not a substantive element of the crime charged, strict chronological specificity or accuracy is not required."). Moreover, the temporal proximity and factual similarity of the Lajas incident and the April 14th alleged airdrop provide adequate evidence that the Lajas incident stemmed from the same conspira-

torial agreement to import and distribute cocaine. The events were separated by a period of only two-and-a-half weeks, employed nearly identical means (*e.g.*, an airdrop at a clandestine airstrip illuminated by battery-powered lights), and involved the same illegal purpose of importing and distributing cocaine. In these circumstances, we conclude that the Lajas incident served as an additional overt act within the conspiracy charged,[16] and was properly admitted as direct evidence of the conspiracy itself. *See Tejada*, 886 F.2d at 487 ("Where evidence of 'bad acts' is direct proof of the crime charged, Rule 404(b) is, of course, inapplicable.").[17]

### B. The 1988 Heroin Purchase

■ At trial, cooperating co-defendant Rosa Rodríguez–Campos ("Rodríguez") testified pursuant to a plea agreement that she was a long-time drug trafficker and that in 1990 she agreed to loan Escobar money to finance his importation of cocaine from Colombia to Puerto Rico. As part of its direct examination of Rodríguez concerning her role in the alleged conspiracy, the government sought to introduce her testimony that Escobar purchased $90,000 worth of heroin from her in 1988.[18] The district court allowed Rodríguez to testify that Escobar had purchased heroin

16. The government's recitation of overt acts in the indictment was unnecessary, as the indictment charged a drug conspiracy in violation of 21 U.S.C. § 846. *See Arboleda*, 929 F.2d at 865. Although overt acts were "gratuitously set forth in the indictment," *Aponte–Suarez*, 905 F.2d 483, 488 (1st Cir.1990), the government was not limited at trial to proof of the alleged overt acts, *see United States v. Bello–Perez*, 977 F.2d 664, 669 (1st Cir.1992).

17. Escobar also raises another argument related to the Lajas incident. Specifically, the government introduced evidence that in January and March 1986, pilot Robert Godbold, a convicted drug smuggler, made two trips to Puerto Rico to discuss arrangements for the Lajas drug importation with co-defendant Santos. Godbold also testified that during one of those trips, he saw Escobar in the apartment where Godbold and Santos were meeting. Escobar argues that the govern-

ment did not notify him that Godbold would testify as to the latter point, *see* Fed.R.Evid. 404(b)("the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial"), and that he was unfairly surprised by that testimony. Because we conclude that the Lajas incident was not 404(b) evidence, but rather was direct evidence of the conspiracy charged, we have no occasion to decide whether Godbold's testimony went beyond matters included in the notice required by Rule 404(b).

18. The government also sought to introduce Rodríguez's testimony that Escobar delivered heroin to Rodríguez's husband while the husband was in prison. The court refused to allow the admission of this testimony.

from her, reasoning that the heroin purchase, although uncharged in the indictment, was relevant and admissible because it helped to explain the history between Rodríguez and Escobar and her willingness to finance Escobar's cocaine trafficking venture.[19] Escobar claims that the district court erred by admitting this testimony concerning the heroin transaction, arguing that it was outside the scope of the charged conspiracy (which pertained only to cocaine, not heroin) and that it was elicited solely for the purpose of showing his propensity to commit drug crimes in violation of Fed.R.Evid. 404(b).

■ Evidence that a defendant on trial for one crime has been involved in another crime or bad act is inadmissible under Fed.R.Evid. 404(b) if it is offered solely to prove the criminal character of the defendant or his propensity to commit crimes of the sort for which he is on trial. *See United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir.1996); *United States v. Johnston*, 784 F.2d 416, 423 n. 10 (1st Cir.1986) (citing *United States v. Zeuli*, 725 F.2d 813, 816 (1st Cir.1984)); *United States v. Fosher*, 568 F.2d 207, 212 (1st Cir.1978). Rule 404(b), however, is not exclusionary. *See Fosher*, 568 F.2d at 212; 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 404.20[3] (2d ed.1997). Rather, the rule permits the introduction of uncharged bad act evidence if the evidence is relevant for purposes other than proof of a defendant's bad character or criminal propensity, subject only to the limitations of Rule 403. *See United States v. Spinosa*, 982 F.2d 620, 628 (1st Cir.1992); *Johnston*, 784 F.2d at 423 n. 10 (citing *Fosher*, 568 F.2d at 212).

■ In a conspiracy case, evidence of other bad acts, subject always to the re-

quirements of Rule 403, can be admitted to explain the background, formation, and development of the illegal relationship, *see United States v. Prevatte*, 16 F.3d 767, 775–76 (7th Cir.1994); *United States v. Jones*, 982 F.2d 380, 382–83 (9th Cir.1993); *United States v. Passarella*, 788 F.2d 377, 383–84 (6th Cir.1986); *United States v. Magnano*, 543 F.2d 431, 435 (2d Cir.1976); and, more specifically, to help the jury understand the basis for the co-conspirators' relationship of mutual trust, *see United States v. Love*, 134 F.3d 595, 603 (4th Cir.1998); *United States v. Pipola*, 83 F.3d 556, 565–56 (2d Cir.1996); *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir.1993); *United States v. Diaz*, 994 F.2d 393, 395 (7th Cir.1993). As the district court observed, *see supra* note 19, the heroin purchase was important to show how a relationship of trust had developed between Escobar and Rodríguez through other similar drug transactions, which in turn explained why Rodríguez would have agreed to finance Escobar's cocaine trafficking venture as she claimed. Such evidence was specially probative of the conspiratorial agreement that existed between them, a fact which was directly in issue and material to the case. *See United States v. Spaeni*, 60 F.3d 313, 316 (7th Cir.1995).

■ Moreover, the potential of prejudice from the heroin purchase evidence, although undeniably present in some quantum, did not substantially outweigh its probative value. Rodríguez's testimony regarding the heroin purchase, although brief, was critical to set the stage for the rest of her testimony concerning the formation, nature, and extent of her conspiratorial relationship with Escobar, and it represented only a tiny fraction of the incriminating evidence presented to the jury during the course of the trial.[20] In

**19.** The district court reasoned:

She can testify she knows him from '88 and they had some drug dealings together, because she is in the conspiracy, she is calling him and telling him that she is willing to finance part of the operations.... [Y]ou

don't come out of the clear blue sky and say I want to finance your drug deals; they knew each other....

**20.** In the ordinary case, the district court should, if requested to do so by defense counsel, issue a limiting instruction to the jury

these circumstances, we find no abuse of discretion in the district court's decision to admit the challenged testimony.[21]

### C. The Wiretap Evidence

Escobar challenges the district court's denial of his motion to suppress evidence derived from intercepted telephone communications, which he says violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2522.

In March 1990 the district court issued a wiretap order authorizing the interception of communications on telephone line 809–256–2600, which was installed at Escobar's business, Sueño Real Construction Company ("Sueño Real"). According to the district court's findings (which are not challenged on appeal), Escobar broke the telephone's receiver in February or March 1990 and refused to pay the telephone bills after becoming upset that people had used the Sueño Real telephone to make long-distance phone calls. Cedrés thereafter "extended a phone line" to Cedrés's grocery business, Colmado El Coquí, which was adjacent to Sueño Real, and paid the phone bills to keep the line in service. Escobar knew that Cedrés had extended the phone line, and in fact used the extension line in Colmado El Coquí himself on several occasions.

Escobar argues that the intercepted communications must be suppressed because they occurred at Colmado El Coquí, rather than at the location specified in the wiretap order, Sueño Real. To support this contention Escobar relies on 18 U.S.C. § 2518(4), which provides that the order authorizing an interception specify five items, including "the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted." 18 U.S.C. § 2518(4)(b).[22] The order's authorization, he argues, was limited to the telephone line at issue, which in turn was limited to the confines of Sueño Real.

We agree that by its terms the order authorized interception of conversations occurring on the telephone line denominated 809–256–2600, which was located in Sueño Real. We find nothing in the statute, however, that requires the wiretap order to have identified the particular locations of various extensions of that telephone line, nor does Escobar cite any authority for that proposition. The telephone line remained located in Sueño Real, as provided in the wiretap order, even though it had apparently been rigged with a long extension cord to enable a person to access the line from a remote location (*i.e.*, the adjacent Colmado El Coquí).

concerning the purpose of such evidence in order to further reduce the potential for prejudice flowing from its admission. *See United States v. Vest*, 842 F.2d 1319, 1327 (1st Cir. 1988); Fed.R.Evid. 105.

**21.** Although the argument is not developed adequately in Escobar's brief, *see United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990), we note his one-sentence contention that "references to Mr. Escobar previously being incarcerated were permitted over vigorous objection." It is true that Cedrés alluded once to the fact that Escobar had previously served time in prison. Although the court denied Escobar's motion for a mistrial, it certainly did not "permit" such testimony. To the contrary, the court immediately issued curative instructions and admonished the

government to keep its questions simple to avoid eliciting further improper testimony. *See United States v. Martinez*, 922 F.2d 914, 924 (1st Cir.1991); *see also Flores–Rivera*, 56 F.3d at 329 (discussing effect on co-defendant Flores–Rivera of Cedrés's testimony concerning Escobar's prior incarceration).

**22.** The order must also specify the identity of the person, if known, whose communications are to be intercepted; a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates; the identity of the agency authorized to intercept the communications, and of the person authorizing the application; and the period of time during which such interception is authorized. *See* 18 U.S.C. § 2518(4)(a),(c)-(e).

Moreover, assuming arguendo that section 2518(4)(b) does require an order to identify the particular locations of various extensions of the same telephone line, it is well-settled that not every failure to comply fully with any requirement provided in Title III necessitates suppression. *See United States v. Cunningham,* 113 F.3d 289, 293–94 (1st Cir.1997); *see also United States v. Donovan,* 429 U.S. 413, 433–34, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977); *United States v. Chavez,* 416 U.S. 562, 574–75, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974); 18 U.S.C. §§ 2515, 2518(10)(a). Rather, "violations of even ... central requirements do not mandate suppression if the government demonstrates to the court's satisfaction that the statutory purpose has been achieved despite the violation." *Cunningham,* 113 F.3d at 293–94 (quoting *United States v. Johnson,* 696 F.2d 115, 121 (D.C.Cir.1982)). To the extent that Title III is designed to protect privacy interests similar to those reflected in the Fourth Amendment, *see id.* at 294, that statutory purpose was served by the district court's finding of probable cause to intercept and by the order's inclusion of other items of particularity, including the identity of the person whose communications were to be intercepted, the nature and location of the telephone line to be intercepted, a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which the communications relate, *see* 18 U.S.C. § 2518(4). Inclusion of the particular location of various extensions of the telephone line (whose location was properly identified in the order) would not have substantially furthered the statutory objectives of protecting privacy interests and ensuring that intercept procedures are used only in "those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano,* 416 U.S. 505 527, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). The district court properly denied Escobar's suppression motion.[23]

## VI. Variance

Escobar contends that his conviction on Count 20, charging him with attempted importation, must be reversed because of a fatal variance between the indictment and the evidence offered at trial. Count 20 of the indictment charged, *inter alia,* that the March 13, 1990 attempted importation took place "at Guayama, Puerto Rico, in the District of Puerto Rico, and elsewhere and within the jurisdiction of this Court." At trial, informant Cedrés testified that the attempted importation took place "around the town of Guánica, that part of the southern coast of Puerto Rico." Escobar moved to strike all evidence related to Count 20 because the

---

23. Escobar also makes two related arguments asserting basically that the wiretap evidence must be suppressed because he was duped into using the 256–2600 line. Citing *United States v. London,* 66 F.3d 1227 (1st Cir.1995), Escobar first contends that Cedrés's decision to pay the phone bills without Escobar's knowledge constituted an impermissible "subterfuge." Escobar cites no authority for the proposition that the identity of the party paying the phone bills is legally significant to the Title III inquiry. In any event, who paid the bills certainly did not give rise to a "subterfuge" in the sense contemplated in *London.* *See London,* 66 F.3d at 1234 (explaining that "subterfuge" occurs "where the government applies to intercept conversations relating to [an authorized matter] while intending to intercept conversations relating to offenses for which interceptions are unauthorized or for

which it has no probable cause to obtain an interception order"). Second, Escobar argues in his brief that his action in breaking the telephone receiver connected to the telephone line 256–2600 and located in Sueño Real represented an "affirmative decision to cease using 256–2600"; that he was thereafter "induced and seduced [by Cedrés] to use the telephone line at [the adjacent] Colmado El Coquí believing it to be a separate and discrete line and not the line which had been wiretapped by the government"; and that the government's continued wiretapping of 256–2600 in these circumstances violated his constitutionally guaranteed right to privacy. We disagree. The wiretap order permitted the government to tap the line, and Escobar's desire to use the line or not to use the line has no relevance to the Title III inquiry.

indictment referred to Guayama, not Guánica. Noting that both towns were in the southern part of Puerto Rico and that they were "not that far apart," the district court denied the motion.

 A variance arises when the proof at trial depicts a scenario that differs materially from the scenario limned in the indictment. *See United States v. Paredes–Rodriguez,* 160 F.3d 49, 56 (1st Cir.1998); *United States v. Arcadipane,* 41 F.3d 1, 6 (1st Cir.1994); *United States v. Vavlitis,* 9 F.3d 206, 210 (1st Cir.1993). A variance requires reversal of a conviction "only if [the variance] is both material and prejudicial, for example, if the variance works a substantial interference with the defendant's right to be informed of the charges laid at his doorstep." *Arcadipane,* 41 F.3d at 6. Where an indictment gives a defendant "particular notice of the events charged, and the proof at trial centers on those events, minor differences in the details of the facts charged, as contrasted to those proved, are unlikely to be either material or prejudicial." *Id.*

 We note preliminarily our reluctance to characterize what happened here as a variance at all, given the breadth of the indictment's description of the physical location of the attempted importation ("Guayama, Puerto Rico, in the District of Puerto Rico, and elsewhere and within the jurisdiction of this Court") and the ambiguity of Cedrés's testimony (namely, that the attempted importation took place "around the town of Guánica, that part of the southern coast of Puerto Rico"). In any event, whatever discrepancy may have existed between the indictment and the evidence adduced at trial was neither material nor prejudicial. The location of the attempted importation was not an element of the crime; both towns are in southern Puerto Rico, and are within the district court's jurisdiction; and Escobar does not contend that the indictment's allegations caused him to be misinformed of the charges against him. In his closing argument to the jury, Escobar pointed out the

purported variance and other evidence that he considered to be contradictory. It was the jury's province to resolve any conflicts in the evidence about the attempted importation, *see United States v. Angiulo,* 847 F.2d 956, 967 (1st Cir.1988), and it rejected Escobar's arguments. In these circumstances, we find no merit to Escobar's claim of a fatal variance.

## VII. Sufficiency of the Evidence

 Escobar challenges the sufficiency of the evidence supporting his convictions on the CCE counts (counts 1 and 12); the assault counts (counts 5 and 6); the weapons counts (counts 7, 15, 16); and one interstate travel count (count 18). In considering his sufficiency challenges, we must take the evidence in a light most favorable to the verdicts, drawing all plausible inferences and resolving all credibility determinations in their favor. *See United States v. David,* 940 F.2d 722, 730 (1st Cir.1991). The evidence may be entirely circumstantial, and the government need not disprove every hypothesis of innocence. *See Rodriguez,* 162 F.3d at 141; *United States v. Hahn,* 17 F.3d 502, 506 (1st Cir.1994) (quoting *United States v. Batista–Polanco,* 927 F.2d 14, 17 (1st Cir. 1991)). We must affirm the verdicts "so long as any rational trier of the facts could have found the essential elements of the crime[s] beyond a reasonable doubt." *David,* 940 F.2d at 730.

### A. Continuing Criminal Enterprise

 A conviction under 21 U.S.C. § 848 for engaging in a CCE requires proof that the defendant (1) committed a felony drug offense, (2) as part of a continuing series of such violations, (3) in concert with five or more persons in relation to whom he acted as a supervisor, organizer, or manager, (4) and from which he obtained substantial income or other resources. 21 U.S.C. § 848; *see United States v. Hahn,* 17 F.3d 502, 506 (1st Cir. 1994); *see also United States v. Chagra,* 653 F.2d 26, 27–28 (1st Cir.1981) (noting

that courts have required three or more violations to constitute a "continuing series"). Escobar asserts that the government failed to establish the second, third, and fourth elements of the CCE offense.

 As to the second element, Escobar contends (1) that the evidence did not establish that the alleged violations were of a "continuing" nature—that is, that they were related to one another, and (2) that the counts related to the 1990 planned importations cannot constitute predicate offenses under the CCE statute because those importations were too "inchoate and incomplete." For the reasons previously set forth in part II(A) *supra*, we find ample evidence of the relatedness of Counts 10, 19, 20, 23, 24, and 33. Furthermore, we find nothing in section 848 that limits predicate offenses to successful, completed drug importations in the manner suggested by Escobar. *See* 21 U.S.C. § 848 (predicate offenses may consist of "violations of [subchapter I] or subchapter II of [chapter 13]").

 Turning to the third element under the CCE statute, Escobar argues that the government failed to prove that he "occupie[d] a position of organizer, a supervisory position, or any other position of management," 21 U.S.C. § 848, with respect to at least five individuals. In determining whether a defendant organized, supervised, or managed a criminal enterprise, we give those terms their ordinary meaning. *See David,* 940 F.2d at 731; *see also United States v. Rouleau,* 894 F.2d 13, 14 (1st Cir.1990) (operative terms must be read in the disjunctive and are distinct in their meaning). Further, there is no requirement that the five individuals be shown to have acted in concert or contemporaneously, *see David,* 940 F.2d at 731 (citing *United States v. Tarvers,* 833 F.2d 1068, 1075 (1st Cir.1987)), nor must the jurors agree on the particular identities of the henchmen, *see id.* (citing *United States v. Aiello,* 864 F.2d 257, 264 (2d Cir.1988); *United States v. Lueth,* 807 F.2d 719, 731 (8th Cir.1986)).

 In this case, Escobar does not expressly dispute that he acted as an organizer, supervisor, or manager with respect to *four* individuals. Indeed, there is ample evidence in the record that Escobar acted in such capacity with respect to co-defendant Soto in the March 5, 1990, telephone offense (Count 19); with respect to Santos in the March 13, 1990 telephone offense (Count 20); and with respect to co-defendants Ismael Santiago–Corujo ("Santiago") and Flores during the conspiracy offense in connection with the April 1990 plans to import cocaine by sea (Count 2).[24] Escobar does dispute, however, that he acted as an organizer, supervisor, or manager with respect to a fifth individual, co-defendant Rivera, during the November 21, 1989,

24. As noted previously, the jury convicted Escobar on Count 2's conspiracy charge, which was one of the predicate offenses identified in Count 1's CCE charge. *See United States v. Rouleau,* 894 F.2d 13, 14 (1st Cir.1990) (conspiracy count may serve as a predicate offense under CCE statute). Although the district court properly vacated the conspiracy conviction on Double Jeopardy grounds to avoid multiple punishment for the same offense, *see, e.g., Rivera–Martinez,* 931 F.2d at 152–53, the government nonetheless relies on the conspiracy count in appraising the sufficiency of the evidence with respect to the CCE conviction. Because the only significance of the district court's vacation of the conspiracy conviction is to prevent multiple punishment for a lesser-included offense, we see no reason why the conspiracy conviction (for which, of course, jury unanimity was required) should not be considered in assessing the sufficiency of the evidence on the CCE conviction. *Cf. United States v. Hall,* 843 F.2d 408, 409 (10th Cir.1988) (although defendant's conspiracy conviction and sentence were vacated on Double Jeopardy grounds, "it does not follow that ... a lesser included conspiracy may not be used as the felony violation required by [the CCE statute]") (internal quotation marks omitted). Viewing the evidence in the light most favorable to the verdict for the purposes of Escobar's sufficiency challenge, *see David,* 940 F.2d at 730, the jury rationally could have found that Santiago and Flores conspired with Escobar in connection with the April 1990 importation plans as alleged in Count 2's list of overt acts.

drug offense. Specifically, he contends that the evidence showed that he had only "an interest" in the transaction, given that Faccio, not he, was the original owner of the cocaine.[25]

To be an organizer, supervisor or manager within the meaning of 21 U.S.C. § 848, however, the defendant "need not be the dominant organizer or manager of the enterprise; he need only occupy some managerial position with respect to five or more persons." *Rodriguez*, 162 F.3d at 142 (quoting *Hahn*, 17 F.3d at 506 n. 4). As to the November 21, 1989 incident, there was evidence that after receiving the cocaine from Faccio, Escobar delivered it to Cedrés, who in turn arranged for Rivera and co-defendant Ríos to smuggle the drugs onto a commercial airline flight; that Escobar purchased airline tickets; and that upon arriving in New York Rivera called Escobar to report that the cocaine had been lost. Moreover, Cedrés testified generally that as to at least fourteen individuals, including Rivera, Escobar was "the top man, the person who would plan, the person who would organize and the person who would order all aspects of the organization." This evidence was sufficient for a rational jury to find that Rivera was acting under the direction of Escobar on November 21, 1989 for the purposes of the CCE statute.

Finally, Escobar contends that the government failed to prove that he obtained substantial income or other resources from the CCE. The substantial income requirement is meant "to exclude trivial amounts derived from occasional drug sales," *Hahn*, 17 F.3d at 507, and may be proven directly (by evidence of revenue or resources) or circumstantially (such as by evidence of the defendant's position in the criminal organization and the volume of drugs handled by the organization), *see id.* In this case, the government introduced evidence showing that from 1985 to 1989 Escobar made expenditures of $238,766 for which no income source could be identified; that in 1989 he spent approximately $300,000 in cash, $216,000 of which came from unidentified sources; and that his net worth as of October 1989 was more than one million dollars. This evidence entitled the jury to conclude that Escobar obtained "substantial income or resources" within the meaning of section 848. Although Escobar contends that the government's evidence contained inconsistencies and that Escobar's flush financial situation could have a benign explanation, he made those arguments to the jury, which was free to reject them. *See United States v. Arango–Echeberry*, 927 F.2d 35, 38 (1st Cir.1991); *United States v. Angiulo*, 847 F.2d 956, 967 (1st Cir.1988). The evidence was sufficient to support Counts 1 and 12.

### B. Assaults on the Customs Officers

Escobar argues that the court erred in instructing the jury that it could convict on counts 5 and 6 (charging him with the April 14, 1986 shootings of the customs officers) on the basis of *Pinkerton* liability,[26] as there was insufficient evidence to establish his participation in a conspiracy on that date. Specifically, Es-

---

**25.** Escobar also suggests that the November 21, 1989 incident cannot constitute a predicate offense for the purposes of the CCE statute because he did not supervise at least five people *during that particular incident.* However, "the supervisory relationship ... need not have existed at the same time with regard to all five persons, and the five persons need not act together." *United States v. Lueth*, 807 F.2d 719, 731 (8th Cir.1986), *cited in David*, 940 F.2d at 731; *see also Richardson*, 119 S.Ct. at 1713 (statutory requirements of derivation of income or resources and action in

concert with five or more persons do not need to be satisfied with respect to each underlying crime).

**26.** *Pinkerton* holds that a conspirator may be held vicariously liable for a substantive crime committed by a co-conspirator if that crime is in furtherance of the conspiracy and is committed while the defendant is a member of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 645–48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

cobar contends that the absence of any direct evidence of an importation actually having occurred on April 14th made it impossible for any rational factfinder to conclude that a conspiracy existed; and that, in any event, the evidence established only his mere presence at the scene where some of the conspiratorial activities allegedly took place.[27] Without sufficient evidence of his participation in a conspiracy on the evening of April 14th, he argues, the *Pinkerton* instruction was improper.

■ To prove the elements of a conspiracy, the government must show beyond a reasonable doubt that the "defendant and one or more coconspirators intended to agree and ... to commit the substantive criminal offense which was the object of their unlawful agreement." *United States v. Tejeda,* 974 F.2d 210, 212 (1st Cir.1992) (quoting *United States v. Lopez,* 944 F.2d 33, 39 (1st Cir.1991)) (alteration in original); *see United States v. Cruz,* 981 F.2d 613, 616 (1st Cir.1992). No particular formalities attend this showing: the agreement may be express or tacit and may be proved by direct or circumstantial evidence. *See United States v. Sepulveda,* 15 F.3d 1161, 1173 (1st Cir.1993); *United States v. Gomez–Pabon,* 911 F.2d 847, 853 (1st Cir.1990). Indeed, "[d]ue to the clandestine nature of criminal conspiracies, the law recognizes that ... a common purpose and plan may be inferred from a development and collocation of circumstances." *Tejeda,* 974 F.2d at 212 (quoting *United States v. San-*

chez, 917 F.2d 607, 610 (1st Cir.1990)) (internal quotation marks omitted).

■ Applying these standards here, we conclude that there was sufficient evidence to support the *Pinkerton* charge. First, contrary to Escobar's assertion, the fact that the government introduced no direct evidence of contraband having been imported by plane on April 14th does not preclude the jury from concluding that Escobar and his cohorts were engaged in a conspiracy to achieve such ends. Proof of the conspiracy's objective having been accomplished is not required to sustain a conspiracy conviction. *See David,* 940 F.2d at 735 (noting that "the law is well-settled that a criminal conspiracy can exist despite the eventual failure of its objective").[28]

■ As to Escobar's claim that the evidence established only his mere presence at the scene of the conspiratorial activities, *see, e.g., United States v. Ocampo,* 964 F.2d 80, 82 (1st Cir.1992), we disagree. Proof of participation in a conspiracy may consist of circumstantial evidence, and jurors are "neither required to divorce themselves from their common sense nor to abandon the dictates of mature experience." *United States v. Ortiz,* 966 F.2d 707, 712 (1st Cir.1992). The government presented evidence that on April 14th co-defendant Flores purchased more than one hundred gallons of aviation gasoline; that Flores and co-defendant Morales entered the Potrero Cuevas Farm in separate vehicles; that law enforcement agents waiting nearby then heard a plane flying overhead;

27. Escobar also contends that the assaults on the customs officers were not planned and were not "reasonably foreseeable" as a necessary or natural consequence of the conspiracy. *See Pinkerton,* 328 U.S. at 647–48, 66 S.Ct. 1180. This contention is completely meritless and warrants no discussion.

28. Escobar also contends in passing that the jury's decision to acquit him of the April 14 substantive drug counts (counts 3 and 4) was inconsistent with its finding of the existence of a conspiracy. There is no inconsistency in such circumstances. *See United States v.*

*Cruz,* 981 F.2d 613, 617 n. 7 (1st Cir.1992) (because under section 846 there is no requirement that the government prove any overt act as an element of the conspiracy, acquittals on substantive counts in no way precluded the defendant's conspiracy conviction). Moreover, even if the verdicts were inconsistent, that would not be a basis for setting aside the conviction. *See United States v. Powell,* 469 U.S. 57, 63–69, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *United States v. Crochiere,* 129 F.3d 233, 239 (1st Cir.1997).

that shortly thereafter agents observed several vehicles exit the farm, including a truck driven by Escobar that carried six passengers, four of whom were dressed in camouflage; that a few days later agents searching the farm discovered a clandestine landing strip, battery-powered lamps that had been purchased by Escobar (one of which had Escobar's fingerprints on it), and sixty gallons of missing aviation fuel. The jury was entitled to infer from this evidence Escobar's participation, rather than mere presence, in the conspiratorial activities. *See United States v. Batista–Polanco*, 927 F.2d 14, 18 (1st Cir.1991); *Tejeda*, 974 F.2d at 213 ("[T]he factfinder may fairly infer ... that it runs counter to human experience to suppose that criminal conspirators would welcome innocent non-participants as witnesses to their crimes."). The evidence was sufficient to support the *Pinkerton* charge.

### C. The Weapons Charges

■■■ Escobar was charged in Count 7 with possessing a machine gun in violation of 18 U.S.C. § 922(*o*)(1).[29] In Counts 15 and 16, he was charged with possessing firearms as a convicted felon in violation of 18 U.S.C. § 922(g)(1).[30] With respect to both Counts 7 and 16, Escobar's main contention is that the uncorroborated testimony of informant Cedrés concerning the weapons charges cannot suffice to support his convictions. Cedrés's testimony, even if uncorroborated, was sufficient to support Escobar's conviction because it was not "incredible or insubstantial on its face." *United States v. Gomez–Pabon*, 911 F.2d 847, 853 (1st Cir.1990) (quoting *United States v. Aponte–Suarez*, 905 F.2d 483, 489 (1st Cir.1990)). Escobar also claims that

the evidence showed that he was not the actual owner of the machinegun at issue in Count 7. There is nothing in the statute to suggest, however, that liability under section 922(*o*)(1) turns on actual ownership; rather, that section makes it unlawful to "transfer or possess" a machinegun. 18 U.S.C. § 922(*o*)(1).

■■■ As to Count 16, charging him with possessing a firearm as a convicted felon, Escobar further contends that his possession of the firearm at issue was too brief to support a conviction. Cedrés testified that in January 1990 co-defendant Fernando Montañez–Bultrón ("Montañez") gave the firearm to Escobar, and that at some point thereafter Escobar gave the firearm to Cedrés with instructions to keep it until Montañez and co-defendant Cruz asked for it. This testimony is sufficient. Even if Escobar actually possessed the firearm for a short period of time, duration of possession is not an element of the statute. *See* 18 U.S.C. § 922(g)(1). Moreover, a defendant's possession need not be actual; constructive possession is encompassed by section 922(g)(1) as well. *See United States v. Wight*, 968 F.2d 1393, 1398 (1st Cir.1992) (holding that "as long as a convicted felon knowingly has the power and the intention at a given time of exercising dominion and control over a firearm or over the area in which the weapon is located, directly or through others, he is in possession of the firearm").

■■■ Finally, with respect to Count 15, also charging him with possessing a firearm as a convicted felon, Escobar notes that (1) the firearm at issue was, under the government's theory of the case, actually possessed by co-defendant Cruz and used

---

**29.** 18 U.S.C. § 922(*o*)(1) provides in pertinent part:
 [Subject to certain exceptions not relevant here], it shall be unlawful for any person to transfer or possess a machinegun.

**30.** 18 U.S.C. § 922(g)(1) provides in pertinent part:
 It shall be unlawful for any person ... who has been convicted in any court of, a crime

punishable by imprisonment for a term exceeding one year ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

to execute Matos; and (2) the jury acquitted Cruz of the killing. Escobar argues that Cruz's acquittal on the murder charge indicates that there was insufficient evidence to show that Cruz actually possessed the firearm; and that if there was insufficient evidence to show that Cruz actually possessed the firearm, then *a fortiori* there was insufficient evidence to show that Escobar constructively possessed the firearm. The logic of Escobar's argument falters at the threshold. Cruz's acquittal on the murder charge does not establish that Cruz did not actually possess the firearm in question, nor does it establish that Escobar did not constructively possess the firearm. Moreover, even if the verdicts were inconsistent (which they are not), this would not justify the vacation of Escobar's conviction under Count 15. *See United States v. Powell,* 469 U.S. 57, 69, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). The evidence was sufficient to support the challenged weapons convictions.

### D. The March 1990 Interstate Travel Charge

Finally, Escobar challenges the sufficiency of the evidence supporting his conviction on Count 18 for aiding and abetting the interstate travel of co-defendant Jorge "Papo Luciano" Valdés–Alvarez ("Valdés") to promote Escobar's drug trafficking, in violation of 18 U.S.C. §§ 1952 & 2. To establish a violation of section 1952, the government must prove: (1) interstate travel or use of an interstate facility; (2) with the intent to distribute the proceeds of or otherwise promote, manage, establish, carry on, or facilitate an unlawful activity; (3) followed by performance or attempted performance of acts in furtherance of the unlawful activity. *See United States v. Arruda,* 715 F.2d 671, 681 (1st Cir.1983); *United States v. Coran,* 589 F.2d 70, 72 (1st Cir.1978). While Escobar concedes that Cedrés's testimony may have established that Valdés traveled from Miami to Puerto Rico (a necessary concession in light of the evidence), Escobar nonetheless contends that the evidence

was insufficient to establish that Valdés' purpose in such travel was "to promote, manage, establish, carry on, or facilitate" Escobar's drug trafficking operation. Cedrés testified, however, that after the attempted importation of March 13, 1990, Escobar spoke of using a friend from Miami, "Papo Luciano," to assist in the importation of drugs through the northeastern coast of Puerto Rico; and that in a recorded telephone conversation, Escobar mentioned a "Georgie" whom he had brought to Puerto Rico from Florida to participate in shipments that were being planned through the northeastern coast of Puerto Rico. This unambiguous testimony was sufficient to allow the jury to conclude beyond a reasonable doubt that Valdés had traveled to Puerto Rico intending to promote, manage, establish, carry on, or facilitate Escobar's drug trafficking activities, and not for some lawful purpose.

## VIII. Conclusion

For the foregoing reasons, we affirm Escobar's convictions in all respects.

*Affirmed.*